THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* IVORY J. TOWNES, Defendant-Appellant.

Fourth District No. 16409

Opinion filed March 31, 1981.

Kennith W. Blan, Jr., and L. Robert Mueller, both of Blan Law Offices, of Danville, for appellant.

Edward Litak, State's Attorney, of Danville (Robert J. Biderman and James K. Horstman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE WEBBER delivered the opinion of the court:

A jury in the circuit court of Vermilion County rendered verdicts against the defendant finding him guilty of the offenses of rape, deviate sexual assault, and home invasion in violation of sections 11—1, 11—3 and 12—11 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, pars. 11—1, 11—3 and 12—11). Judgments were entered on the verdicts, post-trial motions denied and defendant was sentenced to imprisonment, 30 years for rape, 30 years for deviate sexual assault (these sentences to run consecutively), and 10 years for home invasion (this sentence to run concurrently with the others). This appeal followed.

Defendant's principal contention on appeal is that his early admissions to law enforcement officers should have been suppressed pursuant to his motion made for that purpose on the ground that he had been seized within the meaning of *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. Other issues raised on appeal will be discussed at a subsequent point in this opinion.

The evidence disclosed that the complaining witness was awakened in her apartment at about 3 a.m. by a man who was holding an iron bar and demanding money. Following threats and a beating, the actions which led to the charges described above occurred. The complainant was unable to give a description of her assailant other than that he was a black man, not very tall, "lean" or "thin built," had a moustache and lips which were "thick and full." In the course of the struggle the complainant was able to seize the iron bar and struck the intruder behind the ear with it. She also bit his hand. Police investigation corroborated the events which she said had taken place, and medical evidence revealed the presence of semen and severe injuries to the face and neck of the complainant.

Later in the morning the police showed to the victim a series of photographs but she was unable to identify the intruder other than pointing out features in the photographs which were similar to those of her attacker. On the basis of her description and on the limited information elicited from her inspection of the photographs, the police compiled a list of eight "possible suspects." Also utilized in making the compilation was the knowledge of certain detectives of local people with criminal backgrounds. Defendant was included in the list.

The police then began to interview the persons on the list by visiting them at their residences. They came to defendant's home in Georgetown on the day following the events in the apartment, and informed him that they would like to talk to him at the stationhouse at his convenience regarding "an entry into a home and an assault on a woman." It was first suggested that he use his own car to drive to the station but defendant elected to ride with the police so that his mother would have the use of his car. He was permitted to clean up before leaving home. He was not arrested, searched or stripped. According to the police testimony, he was simply part of an investigation which would involve at least seven other black men of the same general description.

Upon arrival at the stationhouse, an officer read to defendant his *Miranda* rights and defendant initialed a form which set forth those rights. At 9:37 a.m. the first interview began and lasted 13 minutes. Defendant's statement was largely alibi in nature and exculpatory as to his wounds.

A second interview began at 10:27 a.m. and lasted about 20 minutes. During it defendant repeated his first story and gave consent to search his car and his room. The *Miranda* warnings were said to be still in effect.

A third interview, with an affirmation of *Miranda*, began at 11:30 a.m. and lasted about 14 minutes. There was discussion about a wound on defendant's head which he explained as having resulted from a splinter.

A fourth interview, again preceded by an affirmation of *Miranda*, began at 1:10 p.m. and lasted four minutes. During the interview defendant was shown a tire iron recovered from his car and apparently marked with blood. He stated that the iron was his and the blood came from an accident when the hood of his car fell upon him. He agreed to a medical examination which revealed several scratches and bruises around his neck, a bump on the back of his head and bruises around both sides of his left middle finger.

At about 4 p.m. defendant was returned to the police station after the medical examination and was placed in a lineup for observation by the victim. She was unable to identify him.

A fifth interview began just before 6 p.m. and lasted until 10:10 p.m. Defendant was again warned of his *Miranda* rights and agreed to speak with the police. This time he admitted being in the victim's apartment but maintained that the relations were consensual. When asked about the

victim's injuries, defendant denied causing them and suggested that she had bumped into something. He claimed that she was uninjured when he left the apartment. Following this interview defendant was booked.

The statement made during this fifth interview was transcribed and introduced at trial as a People's exhibit. At trial, defendant testified that he did choke and beat the victim but denied that the sexual acts were compelled by his violence. Rather, he said, the sexual relations followed the beating in order for the parties to make up.

■■ Defendant on appeal argues that his case is controlled by *Dunaway*. We agree. That case is factually close to the instant one. In *Dunaway*, the officers admitted that they did not have enough evidence to obtain a warrant but proceeded to pick the defendant up and bring him in to the station. He was not told that he was under arrest, although the officers testified that he would have been restrained if he had attempted to leave. The Supreme Court discussed the requirement of probable cause for arrest and the narrow exception involved in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. The court found no facts in *Dunaway* which would justify a *Terry*-type stop and concluded that the interrogation and detention intruded so severely on fourth amendment rights of the defendant as to trigger the safeguards against illegal arrest.

We are unable to discern any substantial distinction between *Dunaway* and the instant case. Here the police had no probable cause to arrest or detain the defendant. His only connection with the events under investigation was that he matched generally a general description given by the victim. The officers themselves testified that there was no intention to arrest him and viewed him only as a "possibility." Yet the defendant was detained for over 12 hours and subjected to 5 separate interrogations until sufficient incriminating statements were obtained to serve as a predicate for arrest. Defendant was never told that he was not under arrest, and likewise was never told that he was free to go at any time. While the latter are not controlling, yet they are significant factors to be considered in the totality of the circumstances.

As in *Dunaway*, there appears a secondary question as to whether the giving of the *Miranda* warnings at each of the five interviews was sufficient to vitiate the illegality of the arrest. In *Dunaway*, the Supreme Court discussed *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254. *Brown* held that where there has been an illegal arrest the giving of the *Miranda* warnings cannot *per se* attenuate the taint and validate the subsequent admissions. The *Dunaway* court relied on *Brown* and held that no intervening event broke the connection between the illegal detention and the confession. It also pointed out that the exclusionary rule serves different purposes in effectuating policies under the fourth and fifth amendments. A voluntary statement for purposes of the fifth amendment is only a threshold requirement for purposes of the fourth. "Indeed,

if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached." 442 U.S. 200, 217, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259.

It is admitted in the instant case that the *Miranda* warnings were given at each interview, but as in *Dunaway* that disposes only of the threshold requirement in judging the validity of the initial detention. That detention was illegal and nothing occurred afterwards to vitiate the taint.

*Dunaway* was followed in this State by *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 401 N.E.2d 295. The facts were much the same as in the instant case. The officers testified that the defendant had not been arrested and that they had no probable cause for arrest. It was undisputed that the defendant was never told that he was, or was not, under arrest. Likewise, he was never advised that he need not accompany the officers to the station. In reversing a denial of defendant's motion to suppress his statement, the court in *Dowdell* focused on the fact that the officers never communicated to the defendant that he was free not to accompany them. "To suggest the defendant was not seized or detained merely because after the fact the police officers disclaimed any intention of arresting the defendant would permit the evasion of fourth amendment protections." 81 Ill. App. 3d 266, 270, 401 N.E.2d 295.

In *People v. McMahon* (1980), 83 Ill. App. 3d 137, 142, 403 N.E.2d 781, the court found no appreciable difference from *Dunaway* and reversed a denial of the defendant's motion to suppress, saying:

> "Both cases involve situations where the defendant was told to accompany police officers to the station for questioning. In both cases, the defendant was not handcuffed, but neither was he told he was free to go. In both cases, the defendant, after receiving and waiving his *Miranda* rights, made incriminating statements which were used against him at trial. In both cases, the defendant was not 'booked' and further processed until after statements were made. Just as there was an arrest in *Dunaway*, there was an arrest in the instant case."

We follow the authority of *Dunaway*, *Dowdell* and *McMahon* and hold that it was error not to suppress defendant's admissions in the instant case. The error is sufficiently grave as to require a new trial.

Defendant has raised several other issues for our consideration. However, in view of our holding on the seizure issue discussed above, none of them will require extended comment. The matters of the alleged failure of the State to supply discovery and of the purported incompetency of the defendant suggested after trial but before sentencing will not arise on retrial. In any event we find no substance to them.

Defendant's final complaints relate to sentencing. He maintains that the imposition of consecutive sentences was an abuse of discretion by the trial court. We disagree.

Section 5—8—4(a) of the Unified Code of Corrections provides in pertinent part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively." Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(a).

The defendant argues that the trial court abused its discretion in entering consecutive sentences on charges of rape and deviate sexual assault because he did not inflict "severe bodily injury" on the victim.

The supreme court has repeatedly held that the trial judge is normally in a better position to determine the punishment to be imposed than the courts of review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) In the instant case, there was ample evidence in the record to document the injuries of the complainant. It was the testimony of the first witness to see the victim, that the complainant's face was "beaten up" and that her eye was almost swollen closed. There was also evidence from the testimony of the doctor who observed the plaintiff's facial injuries and ordered X rays to investigate the possible bone damage that might have been done. Finally, there are pictures of the plaintiff which are a part of this record. These clearly indicate that the injuries inflicted during the course of the commission of these Class X felonies were severe.

We find no reason to disturb the trial court's discretion in this matter. ■■ Finally, defendant contends that section 5—8—4 of the Unified Code of Corrections is unconstitutionally vague. We do not agree. "Severe bodily injury" is a term generally understood. Similar terms, such as "great bodily harm" and "severe personal injury," have been used without difficulty. (*People v. Chambers* (1973), 15 Ill. App. 3d 23, 303 N.E.2d 24; *People v. Cavanaugh* (1957), 18 Ill. App. 2d 279, 152 N.E.2d 266.) Application of the term is guided by standards of common usage, and it is as precise as modern idiom will allow. The statute enjoys a presumption of constitutionality, and defendant has presented insufficient evidence or argument to overcome the presumption.

The judgment of the circuit court of Vermilion County is reversed and the cause is remanded for new trial.

Reversed and remanded.

TRAPP, P. J., and GREEN, J., concur.