THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AL DAVIS *et al.*, Defendants-Appellants.

First District (3rd Division) Nos. 82—2460, 82—2477 cons.

Opinion filed March 31, 1986.

James J. Doherty, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant Al Davis.

Steven Clark and Karen Daniel, both of State Appellate Defender's Office, of Chicago, for appellant Bobby Jean Parker.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Pamela Martin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McGILLICUDDY delivered the opinion of the court:

Following a jury trial, defendants Al Davis and Bobby Jean Parker were each convicted of murder, armed robbery and burglary. Davis was sentenced to concurrent terms of 40 years for murder, 30 years for armed robbery and seven years for burglary. Parker was sentenced to concurrent terms of 24 years for murder, 24 years for armed robbery and five years for burglary. Both defendants appeal. Davis contends that: (1) the trial court erred in denying his motion to

quash arrest and suppress evidence where he was detained in violation of his fourth amendment rights; (2) his oral and written statements were obtained in violation of his fifth amendment rights; (3) physical evidence obtained with Parker's consent to search their apartment should have been suppressed at trial; (4) the trial court erred in denying Davis' motions for severance and (5) he was denied his right to a fair trial by improper prosecutorial comment during closing argument. Parker contends that: (1) the trial court erred in denying her motion for appointment of separate counsel; (2) the trial court erred in denying her motion to suppress pretrial statements obtained without a valid *Miranda* waiver and (3) the trial court committed reversible error during the jury selection process when it advised a prospective juror that defendant might not testify at trial.

On January 2, 1981, Frank Collins was found murdered in his apartment-hotel room at 3750 North Broadway in Chicago. The police began an investigation, and late on the evening of January 10 three officers knocked on Davis' open door. Davis invited them in and was questioned about the murder of his neighbor, Collins. Davis was shown a group of black and white photos, two of which he identified as "Nino" and "Bob." He stated that they had robbed Collins previously and suggested they might be involved in the murder. The officers talked to Davis and Parker for approximately 10 minutes.

The police officers then asked Davis to accompany them to Area Six Headquarters to pursue the investigation. He agreed to go with them. When they arrived at the station, Davis was taken to a small interview room and questioned for about 15 minutes. The officers then informed Davis they were going off duty and asked him to wait to talk to the next shift of investigators. He agreed, and the officers notified the first watch and asked them to continue the investigation. Davis spent the night at the station.

At 9:30 the following morning, two other detectives went to talk to Davis. Davis told them he had not been home on the night of the murder and that Nino and Bob had told him they killed Frank Collins. At about 11 a.m., the detectives left to corroborate Davis' story. They told him they were going to talk to his wife and bring back something to eat.

The detectives arrived at Davis' apartment and questioned Parker for 5 or 10 minutes about the events of December 31. They then returned to the Area Six interrogation room and advised Davis of his fifth amendment rights. Davis stated that he understood his rights and indicated he would talk to the detectives. The detectives reviewed with him the discrepancies between his story and Parker's. Davis

asked for 5 to 10 minutes to "put his head together." The detectives left the interrogation room and returned after a short time and re-advised Davis of his constitutional rights. Davis then discussed his involvement in the crime, stating that Nino and Bob asked him to help them get into Collins' apartment and promised him a share of the proceeds.

The police officers contacted an assistant State's Attorney who arrived at the station shortly before 4 p.m. He gave Davis his *Miranda* warnings, and Davis talked to him about the murder. Davis subsequently gave a tape-recorded statement which was later typed. Davis signed each page of the typed statement and signed his name at the end.

Parker arrived at Area Six Headquarters at approximately 6 p.m. on January 11 in response to a phone call from Davis. She was accompanied by her small child and a friend. Parker asked to see Davis, was told she could not and was told to wait in an interview room. Three detectives arrived to talk to her. They told her Davis had implicated himself in the murder and advised her of her *Miranda* rights. When asked when she knew about the murder, Parker told the officers that Davis, Nino and Bob left her apartment with a pipe to go to Collins' apartment and returned shortly thereafter with a gun, some money and food. She told the officers she also had a microwave oven from Collins' room at her apartment. The officers asked if they could get it and whether she would sign a consent to search her apartment. She agreed and the officers, Parker, her child and her friend proceeded to the apartment. There, the officers had another conversation with her wherein she indicated that she stood in the hallway as a lookout while the three men were in Collins' apartment. She then accompanied the detectives to her friend's apartment on a lower floor and asked her friend to give them the oven. The friend complied, and Parker asked her to take care of her child when she returned to the police station.

Upon her return to the station at about 8 p.m., Parker was re-advised of her rights, which she indicated she understood. She then told the officers that Nino and Bob were made up, that she stood in the victim's apartment while Davis struck the victim several times on his back and head and that Davis went through Collins' pockets for a gun and money while she took other items out of the room. Parker indicated that Davis had forced her to accompany him. Parker was questioned until 1:30 a.m.

At approximately 4 p.m. the following afternoon, Parker was interviewed again after being re-advised of her *Miranda* rights. She said that she went into Collins' room with Davis and took property

from his room back to her apartment. An assistant State's Attorney was contacted and arrived at the station at approximately 10 p.m. He advised Parker of her constitutional rights, and she stated she was in Collins' room with Davis and took property from his dresser. She also stated that Nino and Bob were fictional characters. Parker refused to give a written statement because she did not want to sign anything. The jury found both defendants guilty of murder, armed robbery and burglary.

■ Davis' first argument on appeal is that denial of his motion to quash arrest and suppress evidence was manifestly erroneous where his detention was illegal. He maintains that he was taken from his home and held for 14 hours without probable cause before he admitted participation in the murder.

Custodial interrogation on less than probable cause violates the fourth amendment whether or not the detention has the technical trappings of a formal arrest. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) In further support of his position, Davis relies on those Illinois cases in which the courts have determined that a defendant was in custody despite assertions of the police to the contrary. (See, *e.g., People v. McMahon* (1980), 83 Ill. App. 3d 137, 403 N.E.2d 781; *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 401 N.E.2d 295, *cert. denied* (1980), 449 U.S. 974, 66 L. Ed. 2d 236, 101 S. Ct. 385.) In particular, Davis cites *People v. Townes* (1981), 94 Ill. App. 3d 850, 419 N.E.2d 604.

In *Townes*, a rape victim gave a vague description of her assailant from which the police compiled a list of possible suspects which included the defendant. The police went to defendant's home and asked him to accompany them to the police station. He went with them and was taken into an interview room. He was read his *Miranda* rights and interviewed five times over a 12-hour period, with *Miranda* warnings preceding each interview. Pursuant to his consent, his home and car were searched. He also was placed in a lineup. After his fifth incriminating interview, Townes was formally charged.

The court held that under the *Dunaway* standard, Townes had been illegally detained. The court found that Townes' detention resembled a traditional arrest and a reasonable person would not have felt he was free to leave. In particular, the court pointed to the consistent administration of *Miranda* warnings which would indicate to a reasonable person that he was in custody on suspicion of criminal activity. Since the statements given were the product of an illegal detention, the court held that Townes' motion to suppress them should have been granted. 94 Ill. App. 3d 850, 854, 419 N.E.2d 604, 606-07.

Although in the instant case, as in *Townes*, defendant remained at the police station for an extended period of time, we do not find that Davis was illegally detained. Not every station house interrogation is necessarily so custodial as to indicate arrest. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) The police came to talk to Davis as part of an ongoing investigation which included questioning various residents of the apartment-hotel where Collins was murdered. Further, the police officers testified, and defendant admitted, that Davis had accompanied them and remained at the police station in order to aid in the investigation of the murder of his friend. When the detectives on the day shift went to talk to him, Davis was sitting in an unlocked room drinking coffee. Davis testified that he thought the door was locked and he was not free to leave. The defendant's subjective beliefs, however, are irrelevant to a determination of whether he was illegally detained. (*People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979.) Rather, it is what a reasonable man, innocent of any crime, would have believed under the circumstances. (*People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979.) Among the circumstances to be considered are the administration of *Miranda* warnings (*People v. Townes* (1981), 94 Ill. App. 3d 850, 419 N.E.2d 604), and the absence of the routine procedures associated with arrest. *People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929.

The detectives testified that Davis was not considered to be in custody until the officers returned from checking his story. At that time he was given *Miranda* warnings and was no longer free to leave the station.

■ Where the trial court conducts an evidentiary hearing on a motion to quash arrest and suppress evidence, its finding will not be disturbed on review unless manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766; *People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929.) Here, the trial court found that Davis had voluntarily accompanied the police to the station and remained there voluntarily. The record in the instant case supports the trial court's denial of defendant's motion.

Davis next contends that his oral and written statements were obtained in violation of his fifth amendments rights. He argues, first, that the false exculpatory statement he gave on the morning he spoke to the detectives should have been suppressed because he was not given his *Miranda* warnings. Our determination that Davis was at the police station voluntarily and not considered to be in custody until after the police returned from checking the truth of that statement renders further consideration of this argument unnecessary.

■ Davis also argues that the trial court's finding that his written statement was made voluntarily was manifestly erroneous because he never waived his fifth amendment rights and further, the statement was deceptively obtained. A valid relinquishment of *Miranda* rights is not dependent on a formal waiver. Once a defendant is informed of his rights and indicates that he understands them, his giving of a statement without requesting a lawyer is sufficient evidence that he knows his rights and chooses not to exercise them. (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334; *People v. Williams* (1984), 124 Ill. App. 3d 734, 464 N.E.2d 1176.) The record in the instant case reveals that Davis was advised of his rights before being questioned, indicated he understood them and made oral and written statements without requesting an attorney or indicating he wanted to remain silent.

■ Davis also argues, however, that his written and oral statements were obtained through deception and coercion. He maintains that the police never advised him that his status had changed from witness to suspect. Further, when asked whether he wanted to waive his rights and make a written statement, Davis replied, "I want to know what I'm charged with first," and was told by the assistant State's Attorney that there were no charges yet placed against him. Additionally, after his statement was typed, Davis indicated he could not read well and asked that it be read to him. In reading the typed statement, the assistant State's Attorney omitted the warning, "Anything you say can and will be used against you in a court of law."

Assuming, *arguendo*, that the misstatements and omissions were intentional, Davis' statements are not necessarily rendered involuntary. When determining whether a statement has been voluntarily given, the court must look to the totality of the circumstances. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) The test is whether the statement is made freely and voluntarily without compulsion, or whether defendant's will was overborne at the time he confessed. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) Any deception, while relevant, is but one factor to consider in making the determination. *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.

■ The trial court must determine first whether a defendant has been properly admonished of his fifth amendment rights and whether he knowingly, intelligently and voluntarily waived those rights. The court does not have to be convinced beyond a reasonable doubt and

its findings will not be disturbed unless they are against the manifest weight of the evidence. (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228.) The circumstances in the instant case clearly demonstrate that the trial court's finding that Davis waived his fifth amendment rights and voluntarily made oral and written statements was not against the manifest weight of the evidence. There is nothing in the record to indicate that Davis was coerced or that his will was overborne at any time. Any deception which may have occurred was "neither of a nature likely to produce an untrustworthy confession nor so reprehensible as to be offensive to basic notions of fairness." (*People v. Boerckel* (1979), 68 Ill. App. 3d 103, 385 N.E.2d 815, *cert. denied* (1980), 447 U.S. 911, 64 L. Ed. 2d 861, 100 S. Ct. 2998.) The trial court thus properly denied Davis' motion to suppress.

■ Davis next contends that physical evidence obtained with Parker's consent to search their apartment should have been suppressed. An argument not properly preserved as error through objection at trial and inclusion in a post-trial motion is waived. (*People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.) At trial, the only objection made to the oven recovered with Parker's consent was based on lack of sufficient foundation to admit it into evidence. Davis concedes that the other items recovered were never introduced into evidence. We also note that no objections were made in reference to these other items. Since the alleged error does not rise to the level of plain error, we decline to address this argument. *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070.

■ Davis next contends that the trial court abused its discretion in denying his motions for severance. A defendant has the right to be tried separately from a jointly indicted codefendant only where a separate trial is necessary to avoid prejudice. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 468 N.E.2d 969.) The decision whether to grant severance is a matter of discretion with the trial court; the primary question to be considered is whether the defenses of the codefendants are so antagonistic that they cannot get a fair trial unless severance is granted. (*People v. Ruiz* (1982), 94 Ill. 2d 245, 447 N.E.2d 148.) Davis argues that his defense of compulsion was undermined by Parker's statements which inculpated him.

■ In general, severance is granted where defendants make a specific showing that they have truly conflicting and antagonistic defenses marked by opposition, hostility, antipathy or discord. (*People v. Lee* (1981), 87 Ill. 2d 182, 429 N.E.2d 461.) A true conflict exists, for example, where each defendant attributes an offense to the actions of a codefendant, where each defendant condemns the other and de-

clares the other will testify to facts exculpatory to him and incriminating to the other or where a codefendant's confession implicating the defendant is received into evidence without instructions limiting the admission to its maker. (*People v. Guyon* (1983), 117 Ill. App. 3d 522, 453 N.E.2d 849.) Failure to show such antagonism and independent evidence linking the defendant to the crime negates the necessity of severance. *People v. Guyon* (1983), 117 Ill. App. 3d 522, 453 N.E.2d 849; *People v. Cart* (1981), 102 Ill. App. 3d 173, 429 N.E.2d 553, *cert. denied* (1982), 459 U.S. 942, 74 L. Ed. 2d 199, 103 S. Ct. 255.

We agree with the trial court that Davis failed to show that his defense was truly antagonistic to Parker's. Contradictory defenses are not necessarily antagonistic. (*People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.) Moreover, defendant's own statements implicated him in the crimes with which he was charged. Davis' motion for severance was therefore properly denied.

■ Finally, Davis contends that he was denied a fair trial because of improper prosecutorial comment during closing and rebuttal arguments. A prosecutor is permitted wide latitude in closing argument and the trial court's determination regarding the propriety of the argument will not be overturned on appeal absent a clear abuse of discretion. (*People v. Williams* (1984), 127 Ill. App. 3d 231, 468 N.E.2d 807.) Davis first complains that during closing and rebuttal arguments, the prosecutor repeatedly argued Parker's out-of-court statements, admissible only to impeach her, as evidence against Davis. We disagree. The trial transcript indicates that the prosecutor began his closing argument with a discussion of the evidence against Parker, and then turned to a discussion of Davis' oral and written statements as evidence against him. The transcript of closing argument also demonstrates that the State's theory of the case against Davis was that there was enough evidence in Davis' statements to convict him beyond a reasonable doubt. Moreover, during closing argument, both the prosecutor and the court repeatedly cautioned the jury to consider each defendant's statements only against the declarant. Such limiting instructions have been held to cure latent prejudice to a defendant in circumstances where codefendants' statements are both admitted into evidence. *People v. Rudolph* (1977), 50 Ill. App. 3d 559, 365 N.E.2d 930; *People v. Hoover* (1976), 35 Ill. App. 3d 799, 342 N.E.2d 795; see also *Parker v. Randolph* (1979), 442 U.S. 62, 74-75 n.7, 60 L. Ed. 2d 713, 724 n.7, 99 S. Ct. 2132, 2140 n.7.

■ Davis also complains that the prosecutor accused defense counsel of trying to cover up evidence and trick the jury when he

stated, "What is he afraid you're going to hear? He has tried to squirm out of this from word one \*\*\*" and "He is trying to disguise the fact that his client is guilty," and through repeated references to defense counsel's attempts to "draw the jury away." Comments implying defense counsel is attempting to win an acquittal through trickery or misrepresentation are improper. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.) However, to constitute reversible error, improper remarks must result in substantial prejudice to the defendant. (*People v. Williams* (1984), 127 Ill. App. 3d 231, 468 N.E.2d 807.) An argument that defense counsel was attempting to obscure evidence is not reversible error. (*People v. Thomas* (1983), 116 Ill. App. 3d 216, 452 N.E.2d 77.) Although some of the prosecutor's remarks were perhaps better left unsaid, they are hardly of sufficient magnitude to warrant reversal. *People v. Williams* (1984), 127 Ill. App. 3d 231, 468 N.E.2d 807.

Davis also points to several other instances of alleged prosecutorial misconduct. We find that the complained-of comments, when reviewed in context, were all proper argument.

■■■ Parker's first argument on appeal is that the trial court erred in denying her motion for appointment of counsel separate from that of her codefendant. Each defendant was represented by an attorney from the office of the public defender of Cook County. She maintains that a conflict of interest existed because the appointed attorneys were both members of the public defender's homicide task force and had a close working relationship. When presented with Parker's motion for appointment of separate counsel, the trial court noted that the law in Illinois is that the public defender's office can represent multiple defendants. (See *People v. Miller* (1980), 79 Ill. 2d 454, 404 N.E.2d 199; *People v. Robinson* (1979), 79 Ill. 2d 147, 402 N.E.2d 157.) Parker argues, however, that because the homicide task force is a small subgroup of the public defender's office, it closely resembles a traditional law firm and should be excepted from the rule in *Robinson*.

This argument is without merit. In *Robinson*, the supreme court noted that the public defender's office at issue was small and structurally and quantitively similar to a private law firm. The *Robinson* and *Miller* courts stressed that an attorney's fundamental duty of total loyalty to his client and the guidelines set down by the Illinois and United States supreme courts were adequate to avoid conflicts of interest. The courts favored a case-by-case inquiry over a *per se* rule of disqualification where a public defender's office represents multiple defendants.

In the instant case, Parker's defense was vigorously conducted. Counsel filed and argued motions to quash arrest and suppress statements. He discussed with the prosecution a plea bargain which would have compelled Parker to testify against Davis. Counsel filed two motions to compel the State to carry out the plea bargain agreement, and raised the State's failure to do so as grounds for a new trial. The record also indicates that counsel ably represented Parker during the trial and sentencing hearing.

The State correctly maintains that a showing of undivided loyalty and vigorous representation will rebut a claim of conflict of interest. (*People v. Spicer* (1979), 79 Ill. 2d 173, 402 N.E.2d 169, *cert. denied* (1980), 446 U.S. 940, 64 L. Ed. 2d 794, 100 S. Ct. 2162; *People v. Robinson* (1979), 79 Ill. 2d 147, 402 N.E.2d 157; *People v. Brewer* (1983), 118 Ill. App. 3d 189, 454 N.E.2d 1023, *cert. denied* (1984), 469 U.S. 930, 83 L. Ed. 2d 261, 105 S. Ct. 324.) Since there was no showing made that counsel's loyalty and commitment to Parker were divided in any way, the trial court did not err in denying the motion for appointment of separate counsel.

Parker next contends that the trial court erred in denying her motion to suppress the inculpatory statements she made to the police. She argues first that she was mentally incapable of understanding the *Miranda* warnings and her statements were therefore not the product of knowing and voluntary waiver of her constitutional rights. Parker concedes that every statement given was preceded by proper *Miranda* warnings and Parker's indication that she understood the warnings. She testified at her preliminary hearing, however, that she had not understood them. Dr. Albert Stipes, a psychiatrist, testified that Parker was of borderline intelligence, with a fourth or fifth grade reading level, and capable of understanding and waiving her constitutional rights if they were explained to her in simple terms. He further testified in discussions with her about the individual rights, she was able to explain to him what they meant.

A reviewing court will not disturb the trial court's ruling on a defendant's motion to suppress unless it is against the manifest weight of the evidence. (*People v. Henderson* (1980), 83 Ill. App. 3d 854, 404 N.E.2d 392.) The law is well settled that subnormal mentality alone does not invalidate a voluntary waiver. (*People v. Williams* (1984), 124 Ill. App. 3d 734, 464 N.E.2d 1176; *People v. Padilla* (1979), 70 Ill. App. 3d 406, 387 N.E.2d 985, *cert. denied* (1980), 445 U.S. 961, 64 L. Ed. 2d 235, 100 S. Ct. 1646.) Where, as here, expert testimony is introduced that despite borderline intelligence, the defendant was capable of understanding the meaning of her *Miranda*

warnings, denial of the motion to suppress is proper. *People v. Devine* (1981), 98 Ill. App. 3d 914, 424 N.E.2d 823.

 Parker maintains that her statements were involuntary because her will was overborne by prolonged detention, lack of sleep and food and lack of prior contact with the judicial system. As noted above, the determination of whether a confession is voluntary is made from the totality of the circumstances and the trial court does not have to be convinced beyond a reasonable doubt. (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.) Although Parker testified to inhumane treatment by the police, her testimony was rebutted by testimony from the police officers who stated that she appeared normal and alert, had slept and eaten and that none of her requests were denied. The trial court's denial of Parker's motion to suppress was therefore proper.

 Finally, Parker contends that the court misstated the law to a prospective juror, thereby depriving her of her right to a fair trial. The complained-of remark was:

> "[A]lmost without exception in a civil case, a defendant will take the stand \* \* \*, wherein, in a criminal case, the defendant does not have to take the stand because they have a presumption of innocence, that I repeated to all of you several times, and they are clothed with that presumption of innocence throughout the trial and throughout your deliberations as a jury. So unless the State overcomes that presumption of innocence, then you must find it for the defendant. *So if you feel the State hasn't proven them guilty—they might not put the defendants on the stand.*" (Emphasis added.)

The comment arose during the *voir dire* of a prospective juror who had previously served on a jury in a civil case and for whom the court was distinguishing criminal trials. We note first that the complained-of remark was an accurate statement of the presumption of innocence.

Defendant cites *People v. Kelley* (1983), 113 Ill. App. 3d 761, 447 N.E.2d 973, in support of her position. Her reliance on this case is misplaced. In *Kelley*, the trial court had stated to the prospective jurors its opinion as to what the evidence at trial would show. The instant case is more similar to *People v. Friday* (1973), 11 Ill. App. 3d 1071, 297 N.E.2d 218, which was distinguished in *Kelley*. In *People v. Friday*, the trial court, in the *voir dire* examination, asked the following question:

> "The defendant is presumed to be innocent as he is seated here and that is *for the benefit of all criminals*, but not, in fact,

to aid one who is guilty to escape his just punishment. You appreciate that?" (Emphasis added.)

On review, this court stated:

"This is doubtless an inadvertent misstatement \*\*\*, but we do not believe that it was of sufficient import to constitute prejudicial error, particularly in view of the fact that this was in the *voir dire* examination." 11 Ill. App. 3d 1071, 1075, 297 N.E.2d 218, 221.

In the instant case, the court correctly instructed the jury that defendant's failure to testify should not be considered in arriving at the verdict. Moreover, Parker took the stand in her defense. We find her tortured interpretation of the court's comment to be without merit and of insufficient import to constitute prejudicial error.

For the foregoing reasons, the judgments of the circuit court of Cook County are affirmed.

Affirmed.

RIZZI, P.J., and McNAMARA, J., concur.