SECOND DIVISION
January 24, 2006

No. 1-02-2893

THE PEOPLE OF THE STATE OF ILLINOIS,   )   Appeal from the
   )   Circuit Court of
       Plaintiff-Appellee,   )   Cook County.
   )
   v.   )   No. 00 CR 26901
   )
RAMONA WASHINGTON,   )   The Honorable
   )   James B. Linn,
       Defendant-Appellant.   )   Judge Presiding.

PRESIDING JUSTICE GARCIA delivered the opinion of the court.

In August 2002, a jury found the defendant, Ramona Washington, guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2000)). The trial court sentenced the defendant to a prison term of 20 years. The defendant appeals her conviction, raising four issues, only two of which we address: (1) whether the trial court erred in admitting evidence regarding the scheduled polygraph examination and (2) whether the trial court erred in denying her motion to quash her arrest and suppress statements. For the reasons that follow, we reverse the defendant's conviction and remand the case for a new trial.

## I. BACKGROUND

On December 6, 2000, the defendant found the victim, 78-year-old Joseph Valladay, dead in his bedroom in the apartment

they shared.  The defendant called 911 from a neighbor's house and waited with her friend, Ena Mills, in the gangway for emergency personnel to arrive.  The defendant and the victim had been living together in a basement apartment for eight or nine months.  In November 2000, they had been informed by the new owners of their building that they would have to vacate their apartment by early December.  The new owners then disconnected their lights, heat, and hot water.

Detectives Catherine Rolewicz and Mark O'Connor were assigned to investigate the victim's death.  When they arrived on the scene, they spoke with the defendant outside the apartment.  The defendant identified herself as the victim's granddaughter and told the detectives that she found the victim dead in his bedroom that afternoon.  Rolewicz testified that the apartment did not have heat or electricity; it was dark and officers had to use flashlights to investigate.

Detective Rolewicz found the victim in his bedroom, lying on his bed with his feet on the floor.  Rolewicz observed bruising and lacerations on the victim's head and face that appeared to be several days old.  She also observed blood in the victim's room and on the door jamb, and stains on the wall that appeared to have been wiped down.  Behind the apartment's front door, she observed a wooden two-by-four board with brownish stains that appeared to be blood.

The parties stipulated that swabs of blood taken from the

two-by-four board, the door jamb, and the hallway matched the victim's DNA, and a swab taken from the wall near the bedroom door matched the defendant's DNA.

After observing the victim, Detective Rolewicz spoke with the defendant in the apartment. Rolewicz asked the defendant about the victim's injuries and the defendant informed her that the victim had been robbed four or five days earlier while walking home from a store on 63rd Street. The detectives then asked the defendant and Mills to accompany them to the Area 2 police station for additional questioning. At 6:30 p.m., the defendant was driven in a marked police car to Area 2.

During the hearing on the defendant's motion to quash arrest, Detective O'Connor testified that after observing the victim and his apartment, he believed that there was a possibility that the victim was beaten inside the apartment and did not sustain his injuries in a robbery. O'Connor testified that based on that possibility, he asked the defendant to accompany him to Area 2 to continue the investigation. He testified that the defendant was cooperating in the investigation.

At 10:00 p.m., Detective O'Connor interviewed the defendant in a conference room and asked her about the blood in the apartment. She indicated that she did not notice the blood and that she did not try to wash the walls. O'Connor then sought to verify the defendant's contention that the victim was robbed

3

several days earlier.  According to O'Connor, he decided to keep the defendant at the police station until he could verify her statements.  At some point after O'Connor interviewed the defendant, she was placed in an interview room where she slept on a hard bench.  The interview room was locked for at least part of the time that the defendant was in the room.

At 9:00 a.m., on December 7, 2000, Detective O'Connor spoke to the defendant again and she agreed to take a polygraph test. She remained in the interview room until 5:15 p.m., when she was transported by Detective James Washburn to the polygraph unit at Homan Square.

At trial, Detective Washburn testified that he drove the defendant to Homan Square in a marked police vehicle.  When Washburn first got into the car, he introduced himself and advised the defendant of her rights under Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).  Washburn testified that he and the defendant made small talk about the weather and snow storm.  The defendant then asked him about the polygraph examination.  After he explained how the exam worked and what it measured, the defendant told Washburn "I did it." Washburn asked what she did, and she replied that she killed the victim.  She stated that she and the victim had argued about moving to a new apartment, the victim grabbed or hit her, she got away, grabbed the board, and hit him with it.  Washburn then placed the defendant under arrest.

4

After they arrived at Homan Square, Detective Washburn told Detective O'Connor, who had been driving the defendant's friend Mills to the same location, about the defendant's statement. The detectives then returned the defendant to Area 2 without administering the polygraph examination. O'Connor and Washburn interviewed the defendant at 7:00 p.m., at Area 2. After they gave the defendant her <u>Miranda</u> warnings, she relayed much of the same information that she had told Washburn earlier. In addition, she stated that the victim tried to grab her around the throat and that they fell to the ground. While they were on the ground, the defendant punched the victim four times. The victim tried to punch the defendant when she grabbed the board. The defendant told the detectives that she struck the victim several times and that he fell to the ground. She then helped him up and cleaned him off. She also tried to clean the blood off of the walls. She told the officers that she did not mean to hurt the victim.

At 8:30 p.m., Assistant State's Attorney Scott Herbert interviewed the defendant with Detective Washburn. In addition to relating the same facts that she told Detectives O'Connor and Washburn, the defendant told Herbert that she and the victim were arguing about getting a new apartment and that he turned his back and walked away from her. Herbert asked the defendant about marks on her neck and she stated that the victim did not make them. The defendant's statement was not memorialized that night

because the medical examiner's office had not definitively determined the cause of death. The medical examiner was waiting on additional information from the police investigation before doing so.

On December 8, 2000, the medical examiner ruled the victim's death a homicide. Doctor Aldo Fusaro testified that the victim died of multiple blunt force injuries due to assault. The victim had multiple broken ribs that hampered his breathing. The victim also had emphysema, which contributed to his death.

Assistant State's Attorney Louis Longhitano testified that he interviewed the defendant at 4:25 p.m., on December 8, 2000. After he spoke with the defendant, he interviewed Mills and took her statement. At 7:00 p.m., Longhitano interviewed the defendant again and specifically asked how she had been treated and whether anyone had threatened her or made promises to her to get her to make the statements. The defendant stated that no one had threatened her or promised her anything in exchange for her statement. The defendant then agreed to make a videotaped statement.

At 7:45 p.m., the defendant made a videotaped statement, which was played to the jury. Longhitano testified that the answers the defendant gave in the video were essentially the same as those she had given in the earlier interview. However, the defendant initially told him that the victim's labored breathing was caused by the injuries he suffered during their fight, but on

6

the videotape, the defendant attributed the labored breathing to the victim's asthma.

The defendant testified in her own defense. She testified that she was 36 years old and had been a prostitute for more than 20 years. The defendant met the victim in early 2000. The victim invited the defendant to live with him in his apartment. The defendant testified that in exchange for a place to live, she had sex with the victim, cooked for him, and cleaned his apartment.

In November 2000, the building that the victim and the defendant had been living in was sold and the new owners turned off the hot water, heat, and electricity. The defendant and victim were told that they had to be out of their apartment by the first week in December. During that first week, the defendant tried to talk to the victim about moving, but the victim told her "[w]hatever" and walked away from her. She testified that she grabbed him and told him to listen to her. He turned around, started swearing at her, and hit her in the face. He came toward her and the defendant started punching him. They fell to the floor and continued to swing at one another. When the defendant had the opportunity, she grabbed the board and hit the victim four or five times. She testified that she was not trying to kill the victim.

The defendant realized that she should not have been fighting with the victim and stopped hitting him. She told him

7

that she was sorry and helped him to his bed. The victim told her that everything would be fine and she tried to clean the blood off of the victim's face. She and the victim then talked for a little while.

The next morning, the victim was sitting on his bed when the defendant got up. She fixed him something to eat and went back to bed. The victim did not leave the apartment over the next few days and the defendant testified that she continued to care for him. On December 6, 2000, the victim did not respond when the defendant called to him. She went to his room and found him deceased in his bedroom. The defendant called 911 from a neighbor's house. The defendant initially told the police that she was the victim's granddaughter because she was not proud of the relationship that they had. She also testified that the victim told her that he had been robbed a couple of days before their fight.

After hearing all of the evidence, the jury found the defendant guilty of first-degree murder. The trial court denied the defendant's motion for a new trial and sentenced her to a prison term of 20 years. This appeal followed.

## II. ANALYSIS

On appeal, the defendant argues: (1) the State's multiple references to her scheduled polygraph examination denied her a fair trial; (2) the trial court erred in denying her motion to quash arrest and suppress statements; (3) during closing

argument, the State misstated the evidence and made inaccurate and prejudicial statements designed to inflame the passions of the jury; and (4) her mittimus does not accurately reflect the proper credit for the number of days served.

### A. References to Polygraph Examination

The defendant argues that she was denied a fair trial when the trial court allowed the State to make multiple references to a polygraph examination the defendant was scheduled to take before she made her inculpatory statement. The defendant contends that the State used the evidence, not to respond to any allegations that her statement was coerced, but simply to bolster her inculpatory statement. The State maintains that the evidence was properly admitted because "the testimony was minimal and was necessary to allow the jury to determine whether or not the statement was voluntarily made." The court permitted the references for the stated purpose of showing the circumstances under which the defendant made the statement. The court explained that "the fact that [the defendant] knew that she was on her way to the polygraph and then she started saying things different to law enforcement is relevant and it's much more probative than prejudicial."

During its case-in-chief, the State elicited testimony from Detective Washburn that the police had scheduled a polygraph examination appointment for the defendant and that he drove her to the testing facility for the appointment. He testified that

en route, the defendant asked him several questions about the polygraph examination. He explained to her that the polygraph examiner would bring her into a room and hook her up to certain equipment used to perform the examination. The defendant also asked him what the equipment did. When Washburn started to testify as to his response, the trial court called a sidebar. During the sidebar, the court reiterated that evidence concerning the polygraph examination was limited to the fact that the defendant was on her way to a polygraph examination when she made an inculpatory statement, and the State could not elicit testimony that explained to the jury what the polygraph equipment did. Washburn never testified as to what a polygraph examination did or that the defendant took the examination.

The State again elicited testimony about the scheduled polygraph examination when cross-examining the defendant. The State contends that the evidence was used to impeach the defendant and to establish that she had lied to police before she made her inculpatory statement. After the State asked the defendant whether she told the police that she was the victim's granddaughter or whether she noticed blood in the apartment, the State asked, "And certainly you didn't tell the police or anyone about beating [the victim] with that stick until they said, 'Let's take you for a lie detector test'; is that correct?" The State later asked the defendant if she told the police that she hit the victim with the board before she was on her way to the

polygraph examination.

During closing arguments, the State argued that the defendant made her inculpatory statement while en route to the polygraph examination because at that point she "starts thinking this lie's not going to make it."

The general rule in Illinois is to preclude the introduction of evidence regarding polygraph examinations and their results because (1) the evidence is not sufficiently reliable, and (2) the results may be taken as determinative of guilt or innocence despite their lack of reliability. People v. Jefferson, 184 Ill. 2d 486, 492-93, 705 N.E.2d 56 (1998). Our supreme court has held that the prejudicial effect of admitting such evidence substantially outweighs its probative value, and that admission of the evidence constitutes "'an unwarranted intrusion' into the trier of fact's role in determining the credibility of the witnesses." People v. Jackson, 202 Ill. 2d 361, 368, 781 N.E.2d 278 (2002), quoting People v. Baynes, 88 Ill. 2d 225, 244, 430 N.E.2d 1070 (1981). This evidence, however, may be admitted for the limited purposes of rebutting a defendant's claim that his confession was coerced or, more generally, "'when the issue is the voluntariness of a confession.'" Jefferson, 184 Ill. 2d at 493, quoting People v. Triplett, 37 Ill. 2d 234, 239, 226 N.E.2d 30 (1967).

In Jefferson, the supreme court held that evidence of a scheduled polygraph examination was properly admitted at trial

11

where the defendant claimed that her inculpatory statement was coerced.  Jefferson, 184 Ill. 2d at 496.  The defendant claimed that she made an inculpatory statement because the police promised that, in consideration for the statement, she would be released from custody and would be able to see her family.  The supreme court held that evidence of the defendant's scheduled polygraph examination and her decision to confess before the examination was relevant and admissible to rebut the defendant's allegations of coercion.  Jefferson, 184 Ill. 2d at 496-97.

In contrast, in Jackson, the State introduced evidence that a witness had been confronted with the results of his polygraph test when he made an inculpatory statement against the defendant.  Although the witness testified that the statement was not truthful, he did not assert that it was procured by coercion until after the State questioned him about the polygraph examination.  The State maintained that the evidence was admissible to show the course of conduct leading to the witness's statement; the trial court agreed and admitted the statement "'for a limited purpose.'"  Jackson, 202 Ill. 2d at 365.

The supreme court distinguished Jefferson and held that the polygraph evidence served no legal purpose because, when it was introduced, there was no evidence or claim by the witness that the statement was coerced.  Jackson, 202 Ill. 2d at 370-71. While the evidence in Jefferson was used as a "shield against the defendant's allegation of police misconduct," in Jackson, "the

12

State attempted to use the evidence affirmatively as a sword to advance its own case." Jackson, 202 Ill. 2d at 371. The court held that it would "not condone the anticipatory introduction of polygraph evidence by the State." Jackson, 202 Ill. 2d at 372.

This case is more similar to Jackson than Jefferson. In this case, the State first elicited testimony concerning the defendant's pending polygraph examination from Detective Washburn during its case-in-chief. Prior to his testimony, the defendant did not make any allegations that her statement was coerced or unreliable. Although the State argues in its brief that it had a duty to prove the defendant's statement was voluntary and that the evidence was used to rebut the defendant's affirmative defense of self-defense, this evidence, when it was admitted, "served no proper legal purpose." See Jackson, 202 Ill. 2d at 371. To uphold the State's contention that the polygraph evidence was properly admitted in its case-in-chief to meet its burden of proving the voluntariness of the defendant's statement would nullify the general rule in Illinois barring such evidence as this argument could almost always be made. See Jefferson, 184 Ill. 2d at 492.

Further, we agree with the defendant that the State sought to bolster the validity of her inculpatory statement with this evidence. The State's questions during cross-examination and comments during closing argument suggest that the defendant's statement must be reliable because she was on her way to take a

lie detector test when she made it and her earlier "lie's not going to make it." The State's suggestion of reliability of the defendant's statement based on her anticipated failure of the polygraph test is an improper purpose for the admission of polygraph evidence. See People v. Baynes, 88 Ill. 2d 225, 244, 430 N.E.2d 1070 (1981) (result of polygraph test not reliable); People v. Taylor, 101 Ill. 2d 377, 393, 462 N.E.2d 478 (1984) (knowledge of media reports regarding performance of "clear[ed]" codefendant on a lie detector test tainted prospective jurors).

Although the trial court employed a balancing test in deciding whether to admit the polygraph evidence, it did so prematurely. Before polygraph evidence may be admitted as more probative than prejudicial, the State must first establish that the voluntariness of the defendant's alleged confession is at issue. See Triplett, 37 Ill. 2d at 239; Jefferson, 184 Ill. 2d at 495 (the State properly permitted "to rebut the defendant's claim of coercion with polygraph evidence"). In reversing this court in Jackson, the supreme court stated: "[W]e cannot agree with the appellate court's conclusion that the introduction of polygraph evidence before the witness has opened the door to its admission was merely a harmless timing error." Jackson, 202 Ill. 2d at 371. Here, the State is unable to put forth an argument that the defendant opened the door to the introduction of Detective Washburn's testimony regarding the scheduled polygraph

14

test as Washburn's testimony was presented in the State's case-in-chief.  Absent the door being opened by the defendant, there is no legal purpose for the admission of the polygraph evidence.  See Jackson, 202 Ill. 2d at 371.  Based on our reading of the supreme court's holding in Jackson, the trial court's reliance on the balancing test for admitting the polygraph evidence during the State's case-in-chief was error.  As our supreme court stated: "We did not approve the offensive use of polygraph evidence in Jefferson, and we will not now allow the State to create a straw man only to knock him down, all within its own case in chief."  Jackson, 202 Ill. 2d at 371.  As Jackson makes clear, before the admission of polygraph evidence may be considered, "requiring the State to offer some legally valid foundation prior to admitting inherently unreliable and prejudicial evidence seems but a small intrusion on judicial expediency in light of this court's long-standing general bar on polygraph evidence."  Jackson, 202 Ill. 2d at 372.

Based on the record before us, we hold that it was reversible error to admit the polygraph evidence because it was introduced in the State's case-in-chief and was used as a sword to advance the State's case.  We therefore reverse the defendant's conviction and remand for a new trial.

B. Motion to Quash Arrest and Suppress Statements

Prior to trial, the defendant filed a motion to quash arrest.  The trial court denied the motion and explained that

15

nothing in the record suggested that the defendant was coerced, handcuffed, "being sweated," or treated in an inappropriate fashion.  Further, there was no evidence the defendant ever asked to leave, indicated that she did not want to be at the police station, or indicated that she would have preferred to be somewhere else.  The court explained that the defendant "was talking throughout the time that she was with the police.  They were trying to check out things that she had said.  And as they were checking things out, they were finding inconsistencies with her report.  But she still always persisted in telling the police that she had information about what had happened."

The defendant argues that the trial court erred when it denied her motion to quash arrest because her initial voluntary presence at Area 2 was converted into an unlawful detention during her presence at Area 2 and her inculpatory statements were the fruits of her illegal arrest and inadmissible at trial.

On December 6, 2000, at 6:30 p.m., the defendant accompanied the police to the Area 2 police station.  She was initially placed in a conference room and was interviewed by Detective O'Connor at 10:00 p.m.  Sometime after that interview, the defendant was placed in an interview room that was locked for at least part of the time that the defendant was in the room.  She remained in the room until 5:15 p.m. the next evening, when Detective Washburn drove her to Homan Square.  During the 23 hours the defendant was at Area 2, the defendant spoke with the

16

police on two occasions. The police never informed the defendant that she was free to leave or that she was not under arrest; the police did not tell her that she could not leave or that she was under arrest either. The defendant was not processed, fingerprinted, or handcuffed. Although O'Connor testified that the defendant was free to have visitors, there is no evidence that this information was relayed to the defendant. Additionally, the defendant was not offered the use of a telephone. O'Connor testified that he kept the defendant at Area 2 because he wanted to verify her version of events. Prior to her formal arrest, the defendant was given her Miranda rights only once, when she was being driven to Homan Square by Washburn. While en route, the defendant asked Washburn about the polygraph examination, made an incriminating statement, and was formally arrested.

Where a trial court's ruling on a motion to quash arrest involves factual determinations and credibility assessments, a reviewing court will not reverse the ruling unless it is manifestly erroneous. People v. Chapman, 194 Ill. 2d 186, 217, 743 N.E.2d 48 (2000). However, if there are no factual or credibility disputes and the appeal involves a pure question of law, de novo review is appropriate. Because Detective O'Connor was the only witness at the hearing on the defendant's motion to quash arrest, and the parties do not contend that factual or credibility disputes arose during the hearing, we review the

17

trial court's denial de novo.  Chapman, 194 Ill. 2d at 217.

An arrest or illegal detention without probable cause violates an individual's rights under the Illinois and United States Constitutions.  U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6; People v. Wallace, 299 Ill. App. 3d 9, 17, 701 N.E.2d 87 (1998).  An arrest occurs when a person's freedom of movement is restrained by physical force or a show of authority.  People v. Barlow, 273 Ill. App. 3d 943, 949, 654 N.E.2d 223 (1995). "The test for determining whether a suspect has been arrested is whether, in light of the surrounding circumstances, a reasonable, innocent person would have considered himself free to leave." Wallace, 299 Ill. App. 3d at 17.

Factors Illinois courts consider in determining whether a defendant was arrested include: (1) the time, place, length, mood, and mode of the encounter between the defendant and the police; (2) the number of police officers present; (3) any indicia of formal arrest or restraint, such as the use of handcuffs or drawing of guns; (4) the intention of the officers; (5) the subjective belief or understanding of the defendant; (6) whether the defendant was told he could refuse to accompany the police; (7) whether the defendant was transported in a police car; (8) whether the defendant was told he was free to leave; (9) whether the defendant was told he was under arrest; and (10) the language used by officers.  People v. Jackson, 348 Ill. App. 3d

719, 728, 810 N.E.2d 542 (2004); Barlow, 273 Ill. App. 3d at 949; but see People v. Davis, 142 Ill. App. 3d 630, 636, 491 N.E.2d 1285 (1986) ("defendant's subjective beliefs *** are irrelevant to a determination of whether he was illegally detained"). No factor is dispositive and courts consider all of the circumstances surrounding the detention in each case. People v. Reynolds, 257 Ill. App. 3d 792, 800, 629 N.E.2d 559 (1994). "Even if a defendant was not told that he was under arrest, not touched by a police officer, not handcuffed, fingerprinted, searched, or subjected to any other arrest procedures, he may have been illegally detained if he was not told that he could leave and he did not feel free to leave." Reynolds, 257 Ill. App. 3d at 800.

In this case, the State does not argue that it had probable cause to arrest the defendant prior to the time she made an inculpatory statement on the way to her polygraph examination. It contends that the defendant voluntarily accompanied the police to Area 2 and remained there because she wanted to assist in their investigation. While we agree with the trial court that there is no evidence that the defendant's initial presence at Area 2 was anything but voluntary, "the fact that a defendant initially accedes to a police request to accompany them to the police station does not legitimize the treatment of defendant after he arrived at the station." People v. Young, 206 Ill. App. 3d 789, 801, 564 N.E.2d 1254 (1990).

Illinois courts have repeatedly rejected the proposition that a person who voluntarily agrees to accompany the police to the station for questioning implicitly agrees to remain at the station until the police have probable cause for his arrest. In Young, the court determined that the defendant was subject to an illegal detention even though he had initiated contact with the police and agreed to go to the police station. In making its determination, the court found as persuasive: (1) the defendant was not asked to wait in a public waiting area at the police station; (2) he was placed in a segregated interview room with the door closed; (3) during questioning he did not implicate himself and was not released or told he was free to leave once questioning was over; (4) he was left to sleep in a closed interview room without sleeping facilities; (5) the State did not rebut his contention that he was not allowed use of the telephone; (6) he was in the police station for 12 hours before he made an incriminating statement and the police had sufficient probable cause to arrest him; and (7) he was questioned only once after the initial interview. Young, 206 Ill. App. 3d at 800-01. The court also rejected the State's argument that the defendant was merely a witness, explaining that "[i]f mere questioning was the goal, he would not then have been ignored and left to spend the entire night." Young, 206 Ill. App. 3d at 801.

In Barlow, the defendant voluntarily accompanied his brother to the police station to answer questions about a murder

20

investigation. Although the brother was told he could leave, the defendant was not given that option. He was given his Miranda rights and interviewed. He was then left in a locked interview room for six or seven hours while the police sought to verify his statements. Barlow, 273 Ill. App. 3d at 949-50. The appellate court held that the defendant was under arrest while he was locked in the interview room and "rejected the proposed fiction that a person who voluntarily agrees to submit to interrogation at a police station also implicitly consents to remain in the police station while the police investigate the crime to obtain probable cause for the interviewee's arrest." Barlow, 273 Ill. App. 3d at 950; see also People v. Walls, 220 Ill. App. 3d 564, 579, 581 N.E.2d 264 (1991) (finding it difficult to believe "that citizens typically agree to spend extended periods of time at police stations, kept in small windowless rooms, waiting for the police to conduct their investigations and obtain probable cause for their arrest").

After carefully reviewing the circumstances surrounding the defendant's presence at the Area 2 police station, we find that the circumstances were such that a reasonable person would have concluded that she was not free to leave. Like the defendant in Young, the defendant was not asked to wait in a public waiting area. She was initially placed in a conference room where she was interviewed by Detective O'Connor. After the interview, the defendant was not released or told she was free to leave.

Although the defendant did not implicate herself in the victim's murder or assault, the police moved her to a separate, sometimes locked, interview room where she slept on a hard bench. At 9:00 a.m. the next morning, the defendant was asked if she was willing to take a polygraph examination. The defendant agreed but remained in the interview room until Detective Washburn drove her to Homan Square at 5:15 p.m.

Detective O'Connor indicated that he "kept" the defendant in the interview room until 5:15 p.m., on December 7, 2000, because the police wanted to verify her statements. During that time, the defendant was not moved to a public waiting area or informed that she was free to leave. The trial court's statement that the defendant "always persisted in telling the police that she had information about what had happened" finds no support in the record, because the police interviewed the defendant only once during the 23 hours that she was in the station. O'Connor testified that during that interview, the defendant stated that she did not see the blood in the apartment or try to wash it off the wall. There is no evidence in the record that she provided any incriminating information at that time. The police did not talk to the defendant again until they asked her if she would be willing to take a polygraph examination.

Based on the facts in this case, we find that "[i]t defies credibility for a detainee under such severe and extended circumstances to believe that [her] acquiescence to such

22

treatment was left to [her] voluntary discretion." Young, 206 Ill. App. 3d at 801. We also reject the State's unsupported assertion that the defendant chose to remain at the station because she was homeless, there was a snowstorm, and the police station was warm and well-lit.

A finding that a defendant was subject to an illegal arrest does not resolve the question of whether her inculpatory statements were properly admitted at trial. Wallace, 299 Ill. App. 3d at 18. Statements may be admissible if they were obtained "by means sufficiently distinguishable to be purged of the taint of the illegal arrest." Barlow, 273 Ill. App. 3d at 952. To determine whether a confession was the product of an illegal arrest, courts consider: (1) the proximity in time between the arrest and the confession; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of the police misconduct; and (4) whether the defendant received Miranda warnings. Barlow, 273 Ill. App. 3d at 952. Because the trial court did not address whether the defendant's statements were sufficiently attenuated from the illegal arrest to purge the taint of illegality, the State may seek an attenuation hearing on remand prior to the new trial. See Wallace, 299 Ill. App. 3d at 19.

### C. Closing Arguments

The defendant next argues she was denied a fair trial because during closing arguments the State misstated the law and

23

evidence, made inaccurate, prejudicial statements designed to inflame the passions of the jury, and improperly commented on the repercussions of a verdict other than first-degree murder. Because we are remanding this case for a new trial, we need not reach the merits of these arguments.

### D. Defendant's Mittimus

The defendant also argues that her mittimus must be corrected to reflect the proper number of days credit for time served. Again, because we are remanding this case for a new trial, we need not address this issue.

### III. CONCLUSION

For the reasons stated, we reverse the defendant's conviction and remand for proceedings consistent with this order. A new trial is not barred by the prohibition against double jeopardy because the evidence presented at trial, including the polygraph evidence and the defendant's confession, was sufficient to support the defendant's conviction. See People v. Olivera, 164 Ill. 2d 382, 393, 647 N.E.2d 926 (1995) ("for purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence").

Reversed and remanded with instructions.

WOLFSON and BURKE, JJ., concur.