2023 IL App (1st) 200911
No. 1-20-0911
Modified opinion filed upon grant of petition for rehearing June 30 , 2023

SIXTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 09 CR 02019 |
| DELONDRE TOWNSEND, | ) ) | The Honorable Brian Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justice C.A. Walker concurred in the judgment and opinion.
Justice Tailor specially concurred, with opinion.

**OPINION**

¶ 1        Defendant Delondre Townsend was convicted after a jury trial of first degree murder, for the shooting death of Brandon Riley on December 29, 2008. The victim was driving a van at approximately 1:00 a.m. when his driver's-side rear window was shot out, and the victim sustained a gunshot wound to his head from which he later died. Shortly after the offense, the 18-year-old defendant confessed to the shooting, and two eyewitnesses identified defendant as the shooter. However, 10 years later, at the 2019 trial, defendant denied being the shooter, and the two eyewitnesses recanted. No physical evidence connected defendant to the shooting, and

he was not arrested at the scene of the offense. After considering factors in aggravation and mitigation, the trial court sentenced defendant to 45 years with the Illinois Department of Corrections (IDOC).

¶ 2     On this appeal, defendant claims, first, that the trial court erred by not suppressing his inculpatory statements made at the station house on January 1, 2009, because his detention was a *de facto* arrest and the police lacked probable cause at that time to arrest him. (The questioning that occurred at the station the day before, on New Year's Eve, is not at issue on this appeal.) Second, defendant claims that we should vacate and remand the case for resentencing, because the trial court allegedly gave him a higher sentence based on the victim's death, which is a factor already inherent in the offense. In the alternative, defendant asks this court to exercise the discretion granted to us under Illinois Supreme Court Rule 615(b) to reduce his sentence from 45 years to the statutory minimum of 35 years.

¶ 3     In response to the first claim, the State argues that defendant's station house interview on New Year's Day was a voluntary and consensual encounter rather than an arrest. The State acknowledges in its brief to this court that it lacked probable cause to arrest defendant until he confessed.[1] Since the State does not argue that this was a brief investigative detention or that it had probable cause prior to the moment of confession, we must determine whether the questioning at the police station was a voluntary and consensual encounter; otherwise, the police lacked probable cause for an arrest, and the resulting confession should have been suppressed.

---

[1]The State asserts that "it was at that time [of the confession] the police developed probable cause and arrested defendant."

¶ 4 If we find that the confession should have been suppressed, the State argues, in the alternative, that any error in not suppressing it was harmless because the jury would not have acquitted defendant after hearing the two eyewitnesses' pretrial statements, even though they both recanted. The State makes no argument that defendant forfeited this claim for our review, so the harmless error standard applies.

¶ 5 In response to the second claim, the State argues that defendant forfeited his sentencing claim by failing to object both at sentencing and in a post-sentencing motion. Defendant acknowledges in his brief to this court that his sentencing claim is forfeited. However, defendant argues that his sentencing claim rises to the level of plain error because the evidence at his sentencing was closely balanced. Defendant observes that, at the time of the offense, he was only three months past his eighteenth birthday and was a high school senior, with a 3.2 grade point average, no gang involvement, no drug or alcohol abuse and no juvenile adjudications. He had no convictions other than one misdemeanor in 2018, almost a decade after this offense. Defendant also argues that the trial court's reliance on a factor inherent in the offense was a fundamental error that denied him a fair sentencing hearing. Defendant asks this court to exercise the discretion granted to it by Illinois Supreme Court Rule 615(b)(4) to reduce his sentence to the 35-year statutory minimum. This court permitted supplemental briefing by the parties on the Rule 615(b) issue.

¶ 6 With respect to defendant's first claim, we find that the trial court did err in denying defendant's pretrial motion to suppress and we cannot find this error harmless beyond a reasonable doubt. Thus, we vacate and remand for a new trial. Since we vacate defendant's conviction on this basis, we do not reach the sentencing issue.

¶ 7                                                BACKGROUND

¶ 8                                    I. Pretrial Motion to Suppress

¶ 9          Since defendant argues on appeal that the trial court erred in denying his pretrial motion, we provide the circumstances of this motion and the ensuing pretrial proceeding in detail below.

¶ 10                                      A. Defendant's Motion

¶ 11         On December 19, 2012, defendant filed the first motion to quash his arrest and suppress statements. The motion alleged that, initially, he was questioned at the Cook County Sheriff's Department Markham district station[2] (station) on December 31, 2008, by detectives and Assistant State's Attorney (ASA) Maureen Delahanty and released the same day. The motion further alleged that on the next day, January 1, 2009, at 10:30 a.m., he was taken into custody at his home by a member of the Cook County Sheriff's Police Department, without a warrant or probable cause to arrest. As we noted above, the State does not argue on appeal that the police had either a warrant or probable cause at that time.

¶ 12         Accordingly, the motion moved to suppress the statements made on January 1, 2009, but not the statements made on December 31, 2008.

¶ 13         Defendant filed a second motion to suppress, on July 10, 2015, which was later amended on August 17, 2015, and again amended on September 16, 2015. This second suppression motion alleged that the statements made on both December 31 and January 1 were involuntary.[3] However, defendant's appellate brief states: "That second suppression motion is not at issue on this appeal." Thus, we do not consider it.

---

[2] The Markham district station is located inside the Cook County Circuit Court 6th District courthouse.

[3] At the hearing on this motion, the evidence established that defendant appeared to be having an asthma attack after giving his confession, and the police called paramedics. The trial court found that the statements were not involuntary, and defendant does not appeal this finding.

¶ 14                                    B. Suppression Hearing

¶ 15        On September 22, 2014, the defense called in support of the first motion (1) Officer Frank D'Oronzo, with the Cook County sheriff's police; (2) Lashanna Fulwiley, defendant's sister; and (3) defendant. We provide the details of both direct and cross-examination as necessary to examine the issues in dispute.

¶ 16                                    1. Officer D'Oronzo

¶ 17                                    a. Direct Examination

¶ 18        D'Oronzo testified that he had been a police officer with the Cook County sheriff's police for 21 years. While investigating this offense, he learned that people of interest included men nicknamed Pumkin, E.J., and Boo-man. D'Oronzo was "informed who they were by our gang guys." Detective Rafferty visited the home of defendant, also known as Pumkin, but defendant was not at home. On December 31, 2008, the police received a call from defendant's mother indicating defendant was now at home, and D'Oronzo went there with Detective Ortiz[4] and gang officer Terry Tabb to bring defendant to the station. D'Oronzo and Ortiz's interview of defendant was not videotaped because, at that time, the police "believed him to be a witness." Defendant provided "a written statement as a witness," with ASA Maureen Delahanty present. After the statement was typed and defendant signed it, he was released. The police then picked up the person who defendant alleged was the offender.

¶ 19        D'Oronzo testified that, on January 1, 2009, Detective Stephen Moody, dressed in "a shirt and tie," went to defendant's home to pick up defendant again. D'Oronzo did not go. Detective Moody drove defendant to the station in a plain unmarked car.  Although defendant arrived at the station sometime in the morning or midday, D'Oronzo did not speak to defendant

---

[4]No first name was provided for Ortiz at the pretrial suppression hearing.

until sometime in the early afternoon. Defendant waited in the lobby or roll-call room, which D'Oronzo described as "a big room" with two doors. According to D'Oronzo, while defendant was waiting at the station, he was free to go if he had asked, as he was not handcuffed.

¶ 20        One of the reasons for bringing defendant back to the station on January 1 was for a possible lineup, but that did not happen. D'Oronzo did, however, interview defendant in order "to clarify some information." Specifically, when the police interviewed the suspect whom defendant had identified as the shooter, the suspect adamantly denied that he was the shooter and adamantly denied that he went by the street name provided by defendant. D'Oronzo's interview with defendant on January 1 was videotaped.

¶ 21                           b. Cross-Examination

¶ 22        On cross-examination, D'Oronzo testified that, although the shooting occurred on December 29, the victim did not die until December 31, thereby turning the investigation into a homicide investigation at that time. D'Oronzo did not learn that the victim had died until after his conversation with defendant on December 31. When defendant's mother called the police, she indicated that defendant needed a ride to the station. When D'Oronzo, Ortiz, and Tabb arrived at defendant's home on December 31, D'Oronzo and Ortiz both wore a shirt and tie with their badges and firearms, while Tabb was dressed in jeans, a T-shirt, and a black tactical vest with "Police" written on it. After they knocked on the door or rang the bell, defendant came outside to speak to them. D'Oronzo asked defendant to come with them, and he agreed. The officers did not handcuff defendant, and they did not draw their guns. There were no other police vehicles present, except for the one unmarked car that they had arrived in. After being patted down, defendant was placed in the back seat, without handcuffs. Prior to

the interview on December 31, Ortiz advised defendant of his *Miranda* rights, and defendant agreed to speak with the police. See *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 23    D'Oronzo also testified that, on December 31, defendant first told them that he was with his girlfriend the night of the shooting and that he did not learn of the shooting until the next day. Defendant said that it was not until the next day that he also learned that his name was being discussed in connection with the shooting. Defendant stated that he was going to turn himself in, but he did not want to deal with the police station on New Year's Eve. D'Oronzo indicated to defendant that he did not believe him, and an "interrogation" ensued. Although video equipment was available, the police did not and were not legally required to videotape the interrogation at that point because it was not a homicide investigation, and they did not know that the victim was about to die. D'Oronzo offered defendant the opportunity to take a polygraph test, which was performed on December 31 but rendered "inconclusive" results. After the polygraph test, the officers interviewed defendant again and told him that the polygraph did not indicate that he was being truthful with them. At that point, defendant changed his story.

¶ 24    D'Oronzo testified that, during the second interview on December 31 after the polygraph test, defendant told the police that he was not with his girlfriend. Defendant stated that he received a call from "E.J." or Elijah White, and that, when the shooting occurred, defendant was with White, but defendant was leaving in his mother's vehicle such that defendant did not witness White actually shooting the gun. D'Oronzo told defendant that he did not believe him. However, at that point, the only information that D'Oronzo had regarding defendant being at the scene of the shooting was the information that defendant had just provided.

¶ 25 D'Oronzo testified that defendant changed his story a third time to state that he was present when White did the shooting and then defendant left the scene. D'Oronzo testified that he believed defendant enough to have defendant's statement memorialized in writing by an ASA and that, based on his experience, D'Oronzo would not have called for an ASA to memorialize the statement if he thought defendant was still lying. At that time, D'Oronzo thought defendant was a witness, and he continued his investigation based on that information. D'Oronzo identified the typed statement that was taken by D'Oronzo and Ortiz in the presence of ASA Delahanty and that defendant signed. The last page, which was also signed by defendant, contains a photograph of the person whom defendant identified as the shooter. After the statement was taken, defendant was released and allowed to return home, because the police believed he was a witness. D'Oronzo testified that, if they had thought defendant was involved in the murder, they would not have released him. Moody drove defendant home. Later that night, the victim died.

¶ 26 D'Oronzo testified that the next step in the investigation was to interview the person whom he now believed was the shooter: Elijah White. After learning that the victim died, D'Oronzo asked Moody to pick up defendant again the next morning, January 1, in case they also needed him. When defendant arrived at the station, D'Oronzo was in another room where White was being interviewed by Rafferty. White's interview was videotaped because, at that point, it had become a homicide investigation. White was adamant that he had nothing to do with the shooting and that his nickname was not E.J. When White was offered the opportunity to take a polygraph test, White was "[a]damant about taking it." White stated that he was with his girlfriend that night.

8

¶ 27    D'Oronzo testified that it was unusual for a suspect to be so adamant about taking a polygraph test.[5] Before the test was administered, D'Oronzo testified that he spoke to defendant again and defendant appeared scared. At this point, D'Oronzo did not know whether defendant was hiding the identity of the real shooter. Defendant was with Moody in the roll-call room, and they were watching a Blackhawks game on television. Defendant was not handcuffed. When D'Oronzo approached, he told defendant that he had some things that he wanted to clarify with defendant. D'Oronzo and defendant went to an interview room with Rafferty, and the rest of their conversation was videotaped because it was now a homicide investigation.

¶ 28    D'Oronzo testified that, during that interview which began at 3:49 p.m., defendant eventually admitted to being the shooter. The officers were surprised when they realized they had a confession rather than some clarification.

¶ 29                              c. Redirect

¶ 30    On redirect examination, D'Oronzo confirmed that, on December 31, defendant was "a person of interest," based on a "source of information" who had provided the nicknames Pumkin, E.J., and Boo-Man. The "gang team" said that Pumkin was defendant and E.J. was Elijah White. The "source of information" said that Pumkin shot at the van. Based on that information, defendant was a suspect on December 31, when the officers read him his *Miranda* rights and questioned him. The possible results of the polygraph test were lying, not lying, and inconclusive. The result of defendant's polygraph test was inconclusive, rather than lying.

---

[5] The parties do not allege in their briefs whether the polygraph test was actually administered to White or what the results were.

Elijah White told officers on January 1 that he goes by E not E.J., and he offered no information about the shooting.

¶ 31                                          2. Defendant's Sister

¶ 32            Next, the defense called Lashanna Fulwiley, defendant's sister, as a witness. On January 1, 2009, Fulwiley was present at the house where defendant resided. Fulwiley did not live there but had arrived December 31 and had stayed overnight. Their mother, who lived there, was also present. On the morning of New Year's Day, Fulwiley heard a loud banging on the door and opened the door to see two men in "regular" clothing. One of the men said that he was an investigator and wanted to speak with Pumkin. When Fulwiley looked at him, the man stated defendant's full name. Fulwiley told them to "hold on" and asked her little brother to see if defendant was in the back of the house, and her little brother returned and said that he was. Then she told "them" to tell defendant to come to the living room because people were "here to see him." The police did not enter the home, and Fulwiley "never opened the door to let them in." Defendant came to the door and opened "the screen door." Fulwiley explained that it was a screen door at other times of the year but that it had "glass in it *** because it was wintertime at that time." The police said they needed to speak with him, so defendant stepped outside. They walked down the sidewalk from the house, and Fulwiley could see their lips moving but could not hear the words. The officers patted defendant down, handcuffed him, placed him in the back of their car, and left. Fulwiley did not see defendant again after he was placed in custody.

¶ 33            On cross-examination, Fulwiley testified that she was "uncertain" whether there were two men. As she watched the police and defendant walk away, one door was open, and she

10

was looking through the glass of the "screen door." She stood in the same spot until the police left. Nothing obstructed her view.

¶ 34                                                    3. Defendant

¶ 35                                               a. Direct Examination

¶ 36          Defendant testified that on December 31, 2008, his mother informed him that the police had been to their home and were looking for him. She gave him the card that they had left with her, and he called them. They asked if they could talk to him, and he said, "sure, you can come to the house." The police arrived with five or six cars, but only two officers came to the house. Between 10 and 12 officers were outside. Of the cars, "a couple" were marked squad cars, and "a couple" were regular cars. When they knocked on the door, defendant answered it, and they asked for him by name. After he identified himself, they asked him to come to the police station, and he complied. They did not offer him the opportunity to go to the station on his own. Instead, the officers walked him to a car and told him to place his hands on the car, and they searched him. After the search, they handcuffed his hands behind his back and placed him in the back of a squad car. They drove him to the police station in the Markham courthouse, took off the cuffs, and took him to an interview room. The door of the room was closed, and he was not free to leave. The officer gave him a form with *Miranda* rights and told him to sign it. Defendant did not understand what his rights were because he had never been in trouble before, but he signed it because the officer told him that "the quicker" they got this over with, "the quicker" he could leave.

¶ 37          Defendant testified that there were two officers in the interview room, and they asked him if he knew anything about the murder at a particular intersection on December 29. Defendant told them that he had heard E.J. was involved. The officers took the coat and hoodie

defendant was wearing and said they were testing the clothes for gunshot residue. They put fluid on his hands and told him to place his hands on something. After defendant volunteered to take a polygraph test, they took him to a different room, where the door was also closed. There was never a point when he was alone without an officer or when he was free to leave.

¶ 38    Defendant testified that they typed out a statement for him to sign, which he did, and they returned his clothes to him. Defendant signed each page of the statement. However, he testified that it was not his signature that appeared on the final page with the photograph. Defendant was told that he could make a phone call, and he called his sister to come pick him up, which she did, and they went home. The police did not escort him out; he exited on his own.

¶ 39    Defendant testified that on January 1, he was in the back room of his house, when his niece told him that his mother said to come because the police were at the door. When defendant entered the living room, two plain-clothed police officers were already in the living room, and they told him they needed him to come with them again for further questioning. The officers did not give him the option of driving himself to the station. After defendant walked outside with the officers, they "checked" him for weapons, told him to put his hand behind his back, handcuffed him, and drove him to the Markham police station. At the station, he was taken to a conference room with one closed door. Defendant was never left alone without an officer present, and he was not free to go. After some initial conversation, defendant was moved to the interview room where he had been the day before. In the interview room, he was read his rights. Three officers interviewed him, and they were not the same officers who had transported him to the police station.

¶ 40        Defendant testified that "the first thing" the officers said to him was that they knew he "had something to do with it." They never told him that he was there to view a lineup or a photo array or to provide information. On January 1, there were two or three interviews, and in between interviews, he was kept in the same room. He was in this room for a lengthy period of time, and he provided the names of other people who may have been present at the offense scene.

¶ 41                              b. Cross-Examination

¶ 42        On cross-examination, defendant testified that there were 10 to 12 cars outside his home on December 31; some were marked, and some were unmarked. There were also 10 to 12 officers outside; some were in uniform, and some were not. None removed a gun from a holster. Defendant had the nickname "Pumpkin,"[6] but a lot of people in the neighborhood had the same nickname. On December 31, the police asked him if he knew someone named E.J.; defendant did not bring up E.J.; the police did. Defendant told them that he was at his girlfriend's house until the morning when he heard about the shooting.

¶ 43        Defendant testified that he was not anywhere near the murder scene at the time of the murder. Since he knew he was telling the truth, he volunteered to take a polygraph test. After the test, the police told him that the result was inconclusive and that he was probably not telling them the whole truth. Defendant testified that, after that point, "I didn't tell them nothing else." Defendant acknowledged that he signed a statement on December 31 at 7:55 p.m. After the polygraph test, the police called an ASA to come talk to him. However, after the polygraph test, he did not have any further conversation with the police about the shooting. The ASA

---

[6]During opening statements, counsels spell the nickname as "pumkin" for the court; however, after page 246 of the record, the spelling becomes "pumpkin."

arrived, and she "was on the computer," and "they put [defendant] back in the holding cell." When the ASA was finished, they brought defendant back to the small office where the ASA and an officer were, and the ASA showed defendant the statement. Before defendant signed the statement, the ASA asked him if this was "everything that [he] had told the officers," and he read it and said it was. The ASA also asked if he wanted to make any changes, and he did not. After defendant signed it, the ASA told him he could call home and have someone pick him up. Defendant confirmed that the last page contained a photo of White but denied that the signature on the photograph page was his. All the other signatures on the statement and the *Miranda* form were his.

¶ 44        On the morning of January 1, after his niece came to the back room of the house to tell him that his mother said there were "a whole lot of police out here," defendant came to the living room at the front of the house, looked out of the living room window and observed 10 or 12 police cars outside. Defendant's sister was sitting on the living room couch, and the front door was closed. Defendant sat on the couch, the police rang the doorbell, and his sister got up to answer it. Three plainclothes officers asked to speak to defendant, identifying defendant by his first and last name; they did not use the nickname "Pumpkin." Defendant rose and went to the door, and the police stated: "we need you to come back down to the station for further questioning." Defendant later learned that one of the officers was Detective Moody. Defendant replied: "Okay, I go with you." After defendant left the house with the officers, he walked toward the police car, and he was patted down, handcuffed, placed in the back seat and driven to the station.

¶ 45        Defendant testified that, at the station, he was taken to a conference room, with a big table and a television, where Moody introduced himself. Moody asked defendant questions

such as what he did for a living, but Moody did not ask about the case because, as Moody explained, he was waiting for one of the detectives. Defendant's handcuffs were still on. Moody was watching hockey on television, but defendant was not paying attention because he does not follow hockey. They did not talk about the game, and Moody never left the room. At some point the detective who Moody was waiting for came in, and defendant was taken to the interview room, where he was the day before. They removed the handcuffs, and Moody, Ortiz and D'Oronzo were all there. They started off by saying that they knew defendant had something to do with it. Defendant had more than one conversation with the officers in that room that day. During these conversations, defendant admitted to being the shooter.

¶ 46                                   c. Redirect Examination

¶ 47        On redirect examination, defendant testified that, on both days, he did not believe that he could refuse to go with the police; and, on both days, he was handcuffed, placed in the back seat, and not given the option to go to the station on his own. While at the station, he was in rooms with closed doors, with officers present, and not free to leave. The handcuffs were not removed until he was placed in an interview room. Defendant was not asked to view a lineup or photo array. Defendant did not tell the officers on December 31 that E.J. was Elijah White, and he was not shown the photograph on December 31 that was attached to his statement.

¶ 48                                   4. The State's Case

¶ 49        At the close of defendant's evidence, the State moved for a directed finding that the encounter was voluntary and, thus, the burden had not shifted to the State to show probable cause. While listening to the parties' arguments on the motion, the trial judge informed them that defendant's release from the station "would lead me to believe that he's not a suspect." The judge explained: "I've been doing this long enough to know that the police keep him there

for days at a time if they believe somebody is a suspect. So, I will let you know that, that weighs heavily on me." The proceedings adjourned to permit the trial court to read the transcripts. On January 8, 2015, despite the trial judge's earlier statements, the trial court denied the State's motion for a directed finding and found that the burden had, indeed, shifted to the State.

¶ 50    On March 18, 2015, the hearing resumed with the State's case. The State called Officer Moody, who testified that, in the evening of December 31, 2009, D'Oronzo and Rafferty asked Moody to drive a witness back home. Moody went with Detective Bernson to a conference room and said to defendant: " 'Hey, Delondre, I'm here to take you home.' " Defendant was not handcuffed when Moody entered the conference room, and Moody did not cuff him or pat him down. They walked to an unmarked, white Chevy Impala, and defendant entered the back seat. There was no "cage"; the car had regular front seats and a regular back seat.[7] There was no conversation during the ride except for directions.

¶ 51    Moody testified that, the next day, at about lunch time, Rafferty and D'Oronzo asked him and Bernson to go back to defendant's house and pick up defendant so they could ask him some more questions. Only one car went to defendant's house, which was the car carrying Moody and Bernson. After Moody knocked on the door, a woman answered, and Moody asked for defendant by defendant's full name. It was Moody's practice to ask for people by their full name rather than by a nickname. The woman shut the door, and then defendant came to the door. Moody told defendant that the detectives who defendant spoke with yesterday wanted to speak to him again, and Moody asked defendant "if he minded coming back with us to the

---

[7]On cross-examination, Moody added that there was also no glass separating the front from the back seat. It was just empty space. Moody also clarified that he used the same unmarked police car on both December 31 and January 1.

16

police station." Defendant replied "okay." The officers did not place any restraints on defendant; they did not pat him down; and they did not have their guns drawn. Once at the station, Moody asked defendant to wait in the foyer or entrance area. This area has a door to either enter the station or "go back outside." In the area were "warrant clerks" and "an administrative assistant." The area has a front desk where citizens can ask for information. After Moody and Bernson left defendant to speak with D'Oronzo and Rafferty, no one stayed with defendant. D'Oronzo and Rafferty instructed Moody to bring defendant to the conference room and turn on the television, which Moody did.

¶ 52        Moody testified that they did roll call in this conference room, so the room had a podium and a chalkboard, as well as the television. While defendant was in the roll-call room, he was not restrained in any way, and Moody was the only other person present. Moody turned on the Blackhawks game and explained to defendant why the hockey game was at Wrigley Field, since defendant seemed confused about that. There was no conversation about the case. During the afternoon, Moody was "in and out" of the room. Moody would come in, watch a bit of the game, talk to defendant about it, and then leave. When Moody was out of the room, defendant was not restrained in any way, and defendant was in there by himself. After a few hours, defendant asked when the officers were going to talk to him, and Moody asked D'Oronzo and Rafferty, and then Moody relayed to defendant that they had said that they would be there in a minute. When the other officers came to escort defendant out of the room, they did not handcuff him.

¶ 53        On cross-examination, Moody explained that, since he was a detective at that time, rather than on patrol, he did not have to pat down everyone he placed in his car and that he generally did not pat someone down unless the person was "a suspect or possible offender."

17

After Moody asked defendant if he would mind coming back to the station, Moody did not ask defendant if defendant wanted to bring himself down to the station, because "he just walked out and followed us to the car." Defendant did not mention driving himself. Moody and Bernson were both dressed in plainclothes, with a badge and gun that readily identified them as police officers. The roll-call room had two doors: one that led directly into the foyer and one that led into the rest of the station. When defendant was waiting there, the door to the foyer was open, and the door to the rest of the station was closed. If defendant had asked to go, he could have left. If defendant had asked Moody, Moody would have told D'Oronzo and Rafferty "hey, this guy is leaving. If you want to talk to him, talk to him now." Moody never said to defendant: "hey, do you want to go?"

¶ 54                                5. The Trial Court's Ruling

¶ 55            On April 23, 2015, after listening to argument, the trial court denied defendant's motion. Prior to ruling, the court observed that, "contrary to what the defense argues, petitioner argues the defendant freely goes to the police station on the second time." The trial court found:

> "I believe that there is no Fourth Amendment violation despite what I ruled earlier at the motion for directed finding. There is no Fourth Amendment violation at any time.
>
> Defendant is not a suspect. They are treating him as a witness throughout this matter until he then gives his videotaped statement to Rafferty.
>
> So the motion is denied."

¶ 56                                        II. Trial

¶ 57            In this appeal, defendant does not contest the sufficiency of the evidence against him and does not challenge the admission of any exhibit or piece of evidence at trial other than his pretrial statement on January 1, 2009. Thus, we only summarize the trial evidence below.

18

¶ 58    In sum, the government's evidence at trial consisted primarily of statements by defendant and two eyewitnesses. Prior to trial, two eyewitnesses stated to the police and before a grand jury that they had observed defendant walk to the middle of the street and open fire at the victim's van as the van drove away. The pretrial statements of both witnesses were memorialized in writing and in their grand jury testimony. However, at trial, both witnesses recanted. Similarly, defendant confessed before trial to being the shooter and then recanted at trial.

¶ 59    An assistant medical examiner confirmed that the victim, who was the driver of the van, died from a gunshot wound to the head. A police investigator testified that he recovered 10, 9-millimeter spent cartridge cases at the scene, all fired from a semiautomatic weapon, and that one of the van's windows had been shot out. The State did not argue a motive for the shooting, and the victim's girlfriend, who was a passenger in the van, did not see who fired the shots.

¶ 60                              III. Sentencing

¶ 61    One of the two issues that defendant raises on this appeal concerns the trial court's remarks at the sentencing hearing. Defendant argues that, at sentencing, the trial court considered a factor inherent in the offense, namely, the death of the victim.

¶ 62    At the sentencing hearing on July 2, 2019, the State presented in aggravation a statement from the victim's daughter and the testimony of the victim's sister, who testified that the 23- year-old victim was "a father, a son, a brother and a friend." In aggravation, the State argued that defendant lacked remorse, that the murder appeared to be unprovoked, and that defendant had tried to implicate someone else. Defense objected to the State's argument of "lack of remorse." The trial court overruled the objection, stating "[i]t's argument." In

mitigation, defense counsel argued that defendant was a good student,[8] came from a good family, had "no prior criminality," and had already served 11 years in jail.

¶ 63　　The presentence investigation report (PSI) indicated that, at the time of his arrest, defendant had a 3.2 grade point average in school, was on the basketball team, had completed the eleventh grade, and was a senior in high school. At the time of the offense, he was just three months past his eighteenth birthday. For two years during high school, defendant had been employed at Subway, earning $400 per week, at $8.25 per hour, but he had to leave due to his basketball commitment. As such, the PSI indicated that the "source" of defendant's "employment status" and "income" was "Subway." Defendant had no gang involvement, fathered no children, and spent his free time playing basketball and attending church. Defendant had no juvenile adjudications of delinquency, and he received time served for one misdemeanor battery on February 11, 2018, which was years after this case. Although he reported drinking alcohol on the weekend at parties and a "casual use" of cannabis, he denied having a problem with either alcohol or drugs. Defendant reported a close relationship with both parents and his extended family and that his friends were a close-knit group on the basketball team. The PSI author noted that defendant was "very cooperative" and answered "all questions without hesitation."

¶ 64　　During the hearing, defendant addressed the court and denied that he was the "killer." Defendant stated: "Everything is an assumption, because wasn't none of us present that night when this all happened." Defendant asked the court to consider that, similar to the victim's family, he had also been separated from loved ones:

---

[8]Defense counsel asserted that defendant graduated high school. However, the PSI does not state that defendant graduated but rather indicates that defendant's studies were interrupted by this case. The PSI states that defendant reported being a high school senior at the time of his arrest.

DEFENDANT: "The same way how they deal with their father, I have to deal with that with my father and my mother, too. Me not being able to see my mama, me not being able to talk to my brothers, me not being able to talk to my nieces, me not being able to talk to my nephew, that is that [*sic*] the same thing[.]"

¶ 65    After listening to defendant's remarks and arguments by the prosecutor and defense counsel, the trial court pronounced sentence. The parties agreed that the applicable sentencing range was 35 to 75 years.[9] In his brief to this court, defendant argues that, in pronouncing a sentence "10 years above the minimum, the trial court found precisely one fact in aggravation: [defendant's] 'conduct caused serious harm' in that the victim's 'family lost a loved one.' " We present below the trial court's entire two pages of sentencing remarks, so that the trial court's comment about "a loved one" may be placed in context:

THE COURT: "Okay. First of all, it's not an assumption as to what happened. The jury found you guilty, and I think the jury did the right thing. I think the evidence against you was overwhelming, as far as I'm concerned.

What I find interesting here is how you turn yourself into the victim. You have been convicted of murder. You shot this young man senselessly, for no reason whatsoever that's ever been presented to me, but all of a sudden, you are the victim in this case, because you said you are gone from your family. They will never see their son again and their brother or their father, whatever the case may be. You can still have contact, albeit you will be in jail for a long period of time, but you can still see your family and

---

[9]Normally, the sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5-4.5-20(a) (West 2018). However, defendant was charged with committing the offense while armed with a firearm, which enhances the sentence by 15 years. 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2018) (15-year sentencing enhancement when "the person committed the offense while armed with a firearm").

talk to your family and write letters to your family. So don't turn yourself into the victim. That is the last thing you are is the victim.

As far as I'm concerned, you are a cold-blooded killer, and as I sit here on the bench for as many years as I have been sitting on the bench, these shootings, they make no sense whatsoever. Everybody is brave when they have an illegal gun, but face someone face to face and go fight them? That's something different. It's the cowards that shoot them in the back and fire as the van is going by.

But to say that you are the victim is preposterous. They lost somebody they loved. They will never see him. All they have is memories. You still have your family[;] you can talk to and write to and say things to and write letters to. There's nothing more I can say, because it's so outrageous, it's so outrageous.

I had an opportunity to review the factors in aggravation and mitigation, review the presentence investigation, consider the arguments of the lawyers, and the defendant's conduct caused serious harm. [The victim's] family lost a loved one. And I read here in the presentence investigation you were raised by a loving family. It's not like you were thrown out on the street when you were 10 years old. You were raised by a loving family. You had all the advantages of the world. I see presentence investigations where people have not seen their parents where they were 15 and they are now 25 and they have no relationship. You had the relationship, and you chose to just throw it all away and be the murderer that you are.

Considering factors in mitigation, the defendant had one prior conviction for a battery, so, as far as I'm concerned, he has no history of prior delinquency or criminality.

Based on that, the sentence of the Court will be 45 years [IDOC], 3 years mandatory supervised release."

¶ 66    On July 30, 2019, defendant filed a timely notice of appeal, and this appeal followed.

¶ 67                                ANALYSIS

¶ 68                             A. No Forfeiture

¶ 69    Defendant argues that the trial court erred by failing to suppress the inculpatory pretrial statement that he made on January 1, 2009. As a threshold matter, we observe that he has preserved this issue for our review. To preserve an error for review on appeal, a party must both (1) object at trial and (2) raise the issue again in a posttrial motion. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). This requirement "encourages a defendant to raise issues before the trial court, thereby allowing the [trial] court to correct its [own] errors" and "consequently precluding a defendant from obtaining a reversal through inaction." *Piatkowski*, 225 Ill. 2d at 564.

¶ 70    When a criminal defendant has preserved an issue for our review, the burden is on the State to show that the error, if there was one, was harmless beyond a reasonable doubt. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009). An error is considered harmless if it appears beyond a reasonable doubt that it did not contribute to the verdict. *People v. King*, 2020 IL 123926, ¶ 40. If we find that the trial court erred, the burden switches to the State to persuade us of the error's harmlessness. *McLaurin*, 235 Ill. 2d at 495 ("the State has the burden of persuasion with respect to prejudice" (citing *People v. Herron*, 215 Ill. 2d 167, 181-82 (2005) (the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error)).

¶ 71    To determine whether an error is harmless, a reviewing court may consider: (1) whether the error contributed to the defendant's conviction, (2) whether the other evidence in the case overwhelmingly supported the defendant's conviction, or (3) whether the challenged evidence was duplicative or cumulative. *King*, 2020 IL 123926, ¶ 40.

¶ 72                              B. Fourth Amendment

¶ 73    Defendant claims a violation of his constitutional right against unreasonable seizures.

¶ 74    Both the Illinois Constitution and the fourth amendment of the United States Constitution protect citizens from unreasonable searches and seizures by police officers. *People v. Holmes*, 2017 IL 120407, ¶ 25; U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Article I, section 6, of the Illinois Constitution provides, in relevant part: "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches[ and] seizures ***." Ill. Const. 1970, art. I, § 6. Similarly, the fourth amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ***." U.S. Const., amend. IV. Through the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) the federal protection of the fourth amendment applies to searches and seizures conducted by the states. *People v. Hill*, 2020 IL 124595, ¶ 19.

¶ 75    With respect to article I, section 6, of the Illinois Constitution, the Illinois Supreme Court has chosen to "follow decisions of the United States Supreme Court regarding searches and seizures." *Holmes*, 2017 IL 120407, ¶ 25. "[T]he 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials," such as police officers. *People v. Jones*, 215 Ill. 2d 261, 269 (2005); *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 55.

24

¶ 76    If a search or seizure occurs in violation of the fourth amendment, the fruits of that search or seizure may be suppressed. The purpose of the fourth amendment's exclusionary rule is to protect all of us by deterring fourth amendment violations by the police. *Terry v. Ohio*, 392 U.S. 1, 12 (1968) ("the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging" unreasonable seizures for all citizens); *People v. Flunder*, 2019 IL App (1st) 171635, ¶ 40 ("The fourth amendment is a blunt-edged sword, but it protects the privacy of us all, both the ones with contraband and the ones without it.").

¶ 77                              C. *Prima Facie* Showing

¶ 78    On a motion to suppress, such as the one at issue here, the defendant bears the initial burden of coming forward with proof. *People v. Cregan*, 2014 IL 113600, ¶ 23. If the defendant makes a *prima facie* showing that the evidence or statement was obtained in an illegal search or seizure, the burden then shifts to the State to produce evidence to counter the defendant's *prima facie* showing. *Id.* ¶ 23. However, at the suppression hearing, "[t]he ultimate burden of proof remains with the defendant." *Id.* ¶ 23.

¶ 79    In the case at bar, the trial court found that the burden had shifted to the State. In response, the State called Officer Moody and relied primarily on Moody's testimony to establish the voluntariness of the encounter.

¶ 80                              D. Standard of Review

¶ 81    The standard of review for a motion to suppress is well established. In *People v. Johnson*, 237 Ill. 2d 81, 93-94 (2010), as in our case, the defendant moved to suppress statements that he made at a police station following an alleged illegal arrest, and the supreme court explained the appropriate standard of review, as follows:

25

"In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the [United States] Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 *** (1996). [Citation.] Under this standard, we give deference to the factual findings of the trial court, and we will reject those findings only if they are against the manifest weight of the evidence. [Citation.] However, a reviewing court ' '""remains free to undertake its own assessment of the facts in relation to the issues," ' '" and we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." *Johnson*, 237 Ill. 2d at 88-89.

"Thus, we apply a bifurcated standard of review: (1) rejecting a trial court's factual findings only if they are against the manifest weight of the evidence (2) but reviewing *de novo* the trial court's conclusion as to whether those facts satisfy the legal standard to warrant suppression." *People v. Hernandez*, 2017 IL App (1st) 150575, ¶ 90 (citing *Johnson*, 237 Ill. 2d at 88-89).

¶ 82    "A factual finding is against the manifest weight of the evidence only if the finding appears to be unreasonable, arbitrary, or not based on the evidence or if the opposite conclusion is readily apparent." *Id.* ¶ 91. "*De novo* review means that we perform the same analysis a trial court would perform." *Id.* ¶ 92.

¶ 83    The case at bar required a credibility determination by the trial court, acting as the fact finder, at the suppression hearing. Defendant described the January 1 encounter as practically an invasion of 10 to 12 police vehicles and numerous officers. He claimed that he was handcuffed and watched by an officer at all times. By contrast, Moody testified that only one car with two officers arrived at defendant's home on January 1, that defendant was not handcuffed or even patted down, and that, while waiting at the station, defendant was frequently left alone in a room with an open door, leading to the outside. The trial court noted

the difference in the factual claims and stated that he "believe[d]" there was no fourth amendment violation. This ruling indicates that the trial court resolved the credibility dispute in favor of the police. In our analysis below, we utilize the facts as determined by the trial court.

¶ 84                                    E. Encounter

¶ 85         "Encounters between police officers and citizens have been divided by the courts into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, commonly referred to as '*Terry* stops,' which must be supported by a police officer's reasonable, articulable suspicion of criminal activity [citation]; and (3) consensual encounters that involve no coercion by the police and, thus, do not implicate the fourth amendment." *Bahena*, 2020 IL App (1st) 180197, ¶ 56; *Flunder*, 2019 IL App (1st) 171635, ¶ 25. The last category, which is at issue here, requires drawing a line between voluntary encounters, on the one hand, and fourth amendment seizures, on the other.

¶ 86         "[A] person has been seized when, considering the totality of the circumstances, a reasonable person would believe he was not free to leave." *People v. Oliver*, 236 Ill. 2d 448, 456 (2010). For a seizure to occur, the officer must have "in some manner restrained the citizen's liberty by physical force or show of authority." *People v. Williams*, 2016 IL App (1st) 132615, ¶ 36 (citing *People v. Luedemann*, 222 Ill. 2d 530, 550 (2006)). Distinguishing between a voluntary encounter and a seizure requires a court to analyze how an officer's conduct would objectively appear to a reasonable and innocent person. *Id.* ¶ 37. The "subjective perception" of either the subject or the officer involved is not the determining factor. *Id.*

¶ 87       "Our supreme court has identified different tests for determining whether a person is seized based upon" the different types of encounters. *Id.* ¶ 37. For example, "[w]here police approach a person sitting in a parked vehicle, the appropriate test is whether a reasonable innocent person would believe that he is ' "free to decline the officer's requests or otherwise terminate the encounter." ' " *Id.* ¶ 37 (quoting *Luedemann*, 222 Ill. 2d at 550-51, quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). "However, when the person is walking down the street, the appropriate test is whether a reasonable innocent person would feel free to leave ***." *Id.* ¶ 37.

¶ 88       Our research reveals no separate articulation of the test when the encounter involves a police station. Citizens voluntarily enter police stations every day of the week, to ask or answer questions, to view lineups or photo arrays, and to receive or provide information. Not every encounter with a police officer inside a police station is a seizure. *People v. Gomez*, 2011 IL App (1st) 092185, ¶ 60 (the defendant was not under arrest, although he was waiting at a police station to speak to detectives). On a number line with voluntariness and involuntariness on opposite ends, scenarios where citizens walk into a police station of their own accord to report an offense or to receive information would begin at the farthest voluntariness end. Scenarios where a citizen enters a police station at the request of a police officer begin to move the notch toward the involuntariness end. However, among the facts that make this case so close to the line between a voluntary encounter and a seizure are the fact that the police transported defendant to the station, rather than defendant voluntarily proceeding there on his own, and the fact that he remained there for several hours. *Gomez*, 2011 IL App (1st) 092185, ¶ 59 (the length of the encounter and whether the defendant was transported in a police car are factors a court may consider). Our supreme court has found:

"Generally, the following *Mendenhall* factors indicate a seizure without the person attempting to leave: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; or (4) using language or tone of voice compelling the individual to comply with the officer's requests." *People v. Almond*, 2015 IL 113817, ¶ 57 (citing *Oliver*, 236 Ill. 2d at 456, citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980))).

¶ 89     On the one end, the following facts could be used to argue that this was a voluntary encounter. First, Officer Moody testified that he asked defendant if defendant "minded" coming to the station again, and defendant agreed. Defendant in his testimony admitted that the officers had asked, and he had agreed to go.[10]. *Almond*, 2015 IL 113817, ¶ 58 ("there was no evidence that either officer used language or a tone of voice compelling defendant to comply"). Second, Moody testified that defendant was not handcuffed or patted down, before entering the back seat of the officers' car on January 1. In contrast, D'Oronzo testified that, the day before, on December 31, defendant had been patted down before entering the police vehicle. Third, Moody testified that only one police vehicle arrived at defendant's home. *Almond*, 2015 IL 113817, ¶ 60 ("the police officers' arrival in [one] marked car, standing alone, is insufficient to create [a] threatening presence"). Fourth, this vehicle, which defendant rode in, had no cage. It was a regular vehicle, with a regular back seat and regular front seats. *Gomez*, 2011 IL App (1st) 092185, ¶ 60 ("Defendant was not handcuffed or otherwise restrained and accompanied the detectives in an unmarked police car without a cage."). In addition, D'Oronzo testified that defendant's mother had previously indicated that defendant needed a ride to the police station. Fifth, two officers were involved in the encounter at

---

[10]Defendant testified that he had replied: "Okay, I go with you."

defendant's home and, immediately after arriving at defendant's home around lunchtime, they knocked on the front door and used defendant's proper name. No guns were drawn; the officers did not arrive in the middle of the night; and Moody was dressed in a shirt and tie, with a badge that communicated his office. Defendant corroborated that the officers who came to the door were in plainclothes.[11] *Almond*, 2015 IL 113817, ¶ 58 (the two "officers wore plain clothes, and neither displayed a weapon"); *Gomez*, 2011 IL App (1st) 092185, ¶ 60 (the arrival of officers at 5 a.m. at a private home is "suggest[ive]" of an arrest). Sixth, after arriving at the station, Moody asked defendant to wait in a foyer, where citizens could walk in and out and speak to someone at the front desk. When Moody and Bernson left defendant to find another officer, no officer stayed behind in the foyer to watch defendant. Nothing physically stopped defendant from walking out the door to the street. *Almond*, 2015 IL 113817, ¶ 60 (after the officers' arrival, nothing stopped defendant and others from moving about the store). Seventh, after Moody escorted defendant to the conference or roll-call room, Moody turned on the Blackhawks game and talked about the game. Moody testified that defendant was not asked any questions about the case and was not handcuffed. During his testimony, defendant corroborated that, while in the roll-call room with Moody, defendant was not asked any questions about the case and Moody watched the Blackhawks game.

¶ 90      Eighth, Moody testified that, during the afternoon of January 1, he was in and out of the roll-call room where defendant waited. When Moody was out of the room, defendant was by himself and was not restrained in any way. *Gomez*, 2011 IL App (1st) 092185, ¶ 60 (The defendant was left alone and "was not handcuffed at the station and was kept in a room with

---

[11]D'Oronzo, testified that, on January 1, 2009, Moody was dressed in "a shirt and tie." Moody testified that, in addition to the shirt and tie, he also wore a badge and gun on his belt.

the door open."). Ninth, Moody testified that one of the doors of the roll-call room opened directly to the foyer and that this door was open. Nothing physically stopped defendant from walking out the door, through the foyer, to the street, and then heading home. Tenth, D'Oronzo testified that, during the interview that began at 3:49 p.m., defendant eventually admitted to being the shooter and that the officers were surprised when they realized they had a confession rather than some clarification.

¶ 91    However, we find that the facts indicate that certainly, at some point during the hours while defendant waited at the station, this encounter crossed the line from a voluntary encounter to an involuntary seizure. *People v. Lopez*, 229 Ill. 2d 322, 353 (2008) ("Defendant's voluntary presence at the police station escalated into an involuntary seizure in violation of defendant's fourth amendment rights."). "Illinois courts have repeatedly rejected the proposition that a person who voluntarily agrees to accompany the police to the station for questioning implicitly agrees to remain at the station until the police have probable cause for his arrest." *People v. Washington*, 363 Ill. App. 3d 13, 24 (2006) (the defendant was not free to leave although she initially agreed to accompany police to the station), citing in support *People v. Barlow*, 273 Ill. App. 3d 943, 949 (1995) (the defendant was not free to leave, although he had originally arrived voluntarily at the station) and *People v. Young*, 206 Ill. App. 3d 789, 800 (1990) (the defendant was not free to leave after arriving at the station). We do not have to determine whether he was, or was not seized at the moment he left his home, because the arrest and statement of confession in this case occurred hours later.

¶ 92    First, as the State argues, defendant's release on December 31 would communicate to a reasonable and innocent person that he was not under arrest at the time of his release. However, on the morning of January 1, when the officers came back, their reappearance would

communicate to a reasonable innocent person that something had changed. Also, the fact that on December 31 defendant did not leave until he was told he could go would indicate to a reasonable innocent person that the same would again be true on January 1: i.e., he could not leave without permission.

¶ 93    Second, as we noted above, the police transported defendant to the station rather than defendant voluntarily traveling there on his own. Moody testified that he did not ask defendant if defendant wanted to bring himself to the station. *People v. Gutierrez*, 2016 IL app (3d) 130619, ¶ 59 (the defendant was not free to go where, among other facts, he "was transported in the back of a police car"); *Gomez*, 2011 IL App (1st) 092185, ¶ 59 ("whether the defendant was transported in a police car" is a factor a court can consider in determining whether an arrest occurred).

¶ 94    Third, defendant waited a few hours in the station before his interview with D'Oronzo began. Moody testified that he picked defendant up around lunch time. However, D'Oronzo testified that the videotaped interview in which defendant confessed did not start until 3:49 p.m. Compare with *Gomez,* 2011 IL App (1st) 092185, ¶ 61 ("Defendant was only at the police station for approximately one hour" prior to his arrest.).

¶ 95    Fourth, Moody testified that, when he and defendant first arrived at the station, Moody asked defendant to wait in the foyer or entrance area, to which the public had regular access. However, D'Oronzo and Rafferty specifically instructed Moody to escort defendant out of that foyer and to take him to the roll-call room instead. Thus, defendant was not permitted to remain in a public area. *Washington*, 363 Ill. App. 3d at 25 (factors establishing an illegal detention include that "the defendant was not asked to wait in a public waiting area at the police station").

¶ 96        Fifth, the roll-call room is where defendant spent the majority of his time waiting. While the roll-call room led to the foyer which, in turn, led to the outside, the roll-call room was an interior room in a police station that was *not* generally accessible to the public. The decision to remove a subject from a public area and escort him to a restricted area further within a police station would communicate to a reasonable and innocent person that his movement was being circumscribed. *Washington*, 363 Ill. App. 3d at 25 (in finding an illegal seizure, the court considered that the defendant was "placed in a conference room" rather than a public waiting area).

¶ 97        Sixth, Moody testified that, after defendant had waited for a few hours, defendant asked when the officers were going to talk to him. Moody then asked D'Oronzo and Rafferty, and Moody relayed back to defendant that they said that they would be there in a minute. Moody did not inform defendant he was free to go, and the reasonable implication was that defendant needed to wait. *Gutierrez*, 2016 IL App (3d) 130619, ¶ 59 (defendant was not free to go where, among other factors, "there was no evidence at the hearing that defendant was ever told that he could refuse to accompany the police officers or that he was free to go"); *Washington*, 363 Ill. App. 3d at 25 (in finding an illegal seizure, the court noted that the defendant was not "told she was free to leave"). The circuit court found that Moody's and defendant's conversation was a "[k]ind of casual conversation*** between the officer and the defendant regarding the Hawks game," and the State would have us believe that Moody had nothing better to do than to spend an afternoon watching a Blackhawks game, on and off, while engaged in casual conversation with defendant. However, the most reasonable inference from Moody's presence in the roll call room is that it was to keep a watchful eye on defendant. *See People v. Holveck*,

141 Ill. 2d 84, 96 (1990) ("the record reflects that the show of authority by the officers . . . in guarding the interrogation room justified the defendant's belief that he was not free to leave.").

¶ 98        Seventh, Moody testified that, after the other officers came to the roll-call room, they escorted defendant out of the roll-call room to yet a third room. *Lopez*, 229 Ill. 2d at 353 (a seizure occurred where, among other facts, the defendant "was not permitted to walk around the police station without an escort").

¶ 99        Eighth, D'Oronzo testified that, when he approached defendant in the roll-call room on January 1, he told defendant that he had some things that he wanted to clarify with defendant, but, defendant was not told he was free to go and a reasonable innocent person in defendant's shoes would not have believed he was free to leave at that point. [12]   *Lopez*, 229 Ill. 2d at 353 (a seizure occurred where, among other facts, the defendant "was not advised he was free to leave even though the detectives testified that defendant would have been permitted to leave at this point if he desired").  Later, in the interrogation room, after defendant admitted that he had lied to the officers yesterday and deliberately misidentified the person who went by the initials "E.J.", defendant asked the interrogating detectives to "go get" the person who defendant now identified as E.J. and then "come back and get me."  One of the detectives responded: "You're staying here, you're staying here, until we get him."  When defendant asked how long that would be, the detective replied, "[a]s long as it takes."[13]  A few minutes

---

[12] While defendant has not made an argument regarding his age at the time of the shooting with respect to this issue, this court is mindful that at the time of arrest defendant was only 18 years 3 months and after confessing and realizing that he would not be able to go home, cried for his mother:  which could cause one to question whether an 18-year-old with minimum contact with the criminal justice system would meet the same standard of reasonableness.

[13] Later in the video, one of the officers stated that defendant would stay there until they located both E.J. and another witness, D.H.  Since D.H. was a minor at the time of the offense, we use his initials.

later, defendant stated: "The longest I can stay here is 72 hours." The detective replied: "May be longer, under circumstances. I could get that clock changed as much and as often as I want."

¶ 100     A recapitulation of our analysis is as follows. In *Williams*, 2016 IL App (1st) 132615, this court found that an officer's demand to "come here" was enough to transform a street encounter into a fourth amendment seizure. *Id.* ¶¶ 6, 11, 41. The State points to defendant's release the day before as evidence that defendant was free to go and that the officers considered him a witness, not a suspect.[14] However, the issue is not whether the police thought he was, or was not, a suspect. The question is whether a reasonable innocent person in defendant's shoes would have thought he was free to go. In sum, we find that based on the facts listed (*supra* ¶¶ 92-99) above, the answer is no and accordingly this encounter falls on the involuntary seizure side of the line. *Washington*, 363 Ill. App. 3d at 24 ("No factor is dispositive and courts consider all of the circumstances surrounding the detention in each case.").

¶ 101                                          CONCLUSION

¶ 102     As we noted above, the State acknowledged in its brief to this court that it lacked probable cause to arrest defendant until he confessed. Since the State did not argue that this was a brief investigative detention or that it had probable cause prior to the moment of confession, we had to determine only whether the questioning at the police station was a voluntary and consensual encounter. If it was not, then the police lacked probable cause for an arrest, and the resulting confession had to be suppressed. Since we find that the questioning at the police station on January 1 was not a voluntary and consensual encounter, we find that defendant's statement should have been suppressed.

---

[14] It is also interesting to note that at the end of the interrogation video, the officer was locked in the room with defendant and had to wait for someone on the other side to come let him out. Thus, if the officer could not leave that room at will, then defendant likely could not have left at will before the confession.

¶ 103　　　　As the State did not argue forfeiture, we applied the harmless error standard. Although the 18-year-old defendant confessed and two eyewitnesses previously identified him as the shooter, defendant denied being the shooter at trial and the two eyewitnesses recanted at trial. No physical evidence connected defendant to the shooting, and he was not arrested at the scene of the offense. Since the now suppressed confession was, by far, the primary evidence against defendant, this error was not harmless. The error contributed to defendant's conviction; the other evidence was not overwhelming; and the challenged evidence was neither duplicative nor cumulative. *King*, 2020 IL 123926, ¶ 40. Thus, we vacate defendant's conviction and remand for a new trial.

¶ 104　　　　Vacated and remanded.

¶ 105　　JUSTICE TAILOR, specially concurring:

¶ 106　　　　I concur in the majority's decision and write separately to provide additional rationale to reverse and remand for a new trial because the police seized Townsend on January 1, 2009, before he confessed, in violation of the fourth amendment. First, as the majority explains, before Townsend confessed, an investigating detective told Townsend that he could not leave until police had located and spoken to Jackson and D.H. and completed the investigation. I would add that the detective also told Townsend that he could keep him at the police station for 72 hours and maybe longer, that as long as the detective was actively working the case that he could keep Townsend at the police station, and that he could charge Townsend with "obstruction" if he did not cooperate.

¶ 107　　　　If the investigating detective's command to Townsend that he was not free to leave was not dispositive by itself, there is more. First, police testing of Townsend's clothing for gunshot residue is indicia that he was seized. Investigating detective Frank D'Oronzo testified at the

36

suppression hearing that Townsend's coat and hoodie were not tested for gunshot residue, but in the video-taped interrogation of Townsend the following day, D'Oronzo admits that the police had in fact collected Townsend's coat for purposes of gunshot-residue testing. *See People v. Jackson*, 374 Ill. App. 3d 93, 103-04 (2007) (taking clothing for purposes of gunshot-residue testing conveys to individual being questioned that he is not free to leave). The State does not attempt to defend detective D'Oronzo's testimony that Townsend's outerwear was not tested, but only speculates that Townsend may have volunteered to submit his coat for testing.  I see no basis for such speculation.

¶ 108        Second, detective Stephen Moody stood guard over Townsend for the entire two-hour period that Townsend was waiting in the roll call room on January 1, 2009, for investigating detective D'Oronzo to arrive and resume his questioning of Townsend from the day before. Townsend was clearly seized at this point. The circuit court, however, characterized detective Moody's presence as innocuous, stating it was "[k]ind of casual conversation it seems to be between the officer and the defendant regarding the Hawks game." The circuit court misapprehended the significance of detective Moody's presence.  The only logical and reasonable explanation for detective Moody's continuous presence was to stand guard over Townsend so that he could not leave. The State would have us believe that detective Moody had nothing better to do than to spend two hours watching a Blackhawks game on television while engaged in casual conversation with Townsend. No reasonable factfinder could conclude that detective Moody's presence in the roll call room was for anything other than to stand guard over Townsend. *See People v. Holveck*, 141 Ill. 2d 84, 96 (1990) ("the record reflects that the show of authority by the officers . . . in guarding the interrogation room justified the defendant's belief that he was not free to leave.").

¶ 109    The State, however, argues that detective Moody testified that he left the roll call room several times for 5 or 10 minutes each time. Townsend, on the other hand, testified that detective Moody never left the room. Townsend's testimony was confirmed by investigating detective D'Oronzo, who testified that detective Moody remained with Townsend in the roll call room at all times on January 1. Moreover, detective Moody is the same officer who picked up Townsend from his home on January 1, and offered the incredible testimony that he did not frisk or pat-down Townsend before placing him in the back seat of the police car. Detective Moody acknowledged that the police car did not have a "cage" and that Townsend was not otherwise restrained in the back seat of the car. Townsend and his sister, on the other hand, testified that Townsend was checked for weapons and handcuffed before being put into the back seat of the police car. By the time they picked him up again on January 1, 2009, the police were already skeptical of Townsend. On December 31, 2008, Townsend changed his story at least twice and investigating detective D'Oronzo told Townsend at least twice that he did not believe him. In addition, Townsend was patted down the day before, on December 31, before he was placed in the police car and transported to the police station. That is because, as the detective testified, a pat-down or frisk is part of police department policy and protocol in this situation. That Townsend would be placed in the back seat of a cageless police car, unrestrained, without first being searched for weapons when two detectives, including detective Moody, were riding in the front seat and the detectives thought Townsend was not telling the truth about his involvement in Riley's shooting defies all common sense and is inherently incredible. Viewing detective Moody's testimony in that light and considering that investigating detective D'Oronzo testified that detective Moody remained with Townsend in

the roll call room at all times, detective Moody's testimony that he left Townsend alone several times in the roll call room on January 1 is inherently incredible.

¶ 110 This is not a close case. Townsend had been seized by the police before he confessed, in violation of his rights under the fourth amendment.

*People v. Townsend*, 2023 IL App (1st) 200911

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 09-CR-02019; the Hon. Brian Flaherty, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Gavin J. Dow, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Joseph Alexander, and Gerrard R. Burch Jr., Assistant State's Attorneys, of counsel), for the People. |